# LUCAS *v.* SOUTH CAROLINA COASTAL COUNCIL

No. 91–453.   Argued March 2, 1992—Decided June 29, 1992

1004

SCALIA, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, O'CONNOR, and THOMAS, JJ., joined. KENNEDY, J., filed an opinion concurring in the judgment, *post*, p. 1032. BLACKMUN, J., *post*, p. 1036, and STEVENS, J., *post*, p. 1061, filed dissenting opinions. SOUTER, J., filed a separate statement, *post*, p. 1076.

*A. Camden Lewis* argued the cause for petitioner. With him on the briefs were *Gerald M. Finkel* and *David J. Bederman.*

*C. C. Harness III* argued the cause for respondent. With him on the brief were *T. Travis Medlock*, Attorney General of South Carolina, *Kenneth P. Woodington*, Senior Assistant Attorney General, and *Richard J. Lazarus.**

---

*Briefs of *amici curiae* urging reversal were filed for the United States by *Solicitor General Starr, Acting Assistant Attorney General Hartman, Deputy Solicitor General Wallace, Deputy Assistant Attorney General Clegg, Acting Deputy Assistant Attorney General Cohen, Edwin S. Kneedler, Peter R. Steenland, James E. Brookshire, John A. Bryson,* and *Martin W. Matzen;* for United States Senator Steve Symms et al. by *Peter D. Dickson, Howard E. Shapiro,* and *D. Eric Hultman;* for the American Farm Bureau Federation et al. by *James D. Holzhauer, Clifford M. Sloan, Timothy S. Bishop, John J. Rademacher,* and *Richard L. Krause;* for the American Mining Congress et al. by *George W. Miller, Walter A. Smith, Jr., Stuart A. Sanderson, William E. Hynan,* and *Robert A. Kirshner;* for the Chamber of Commerce of the United States of America by *Stephen A. Bokat, Robin S. Conrad, Herbert L. Fenster,* and *Tami Lyn Azorsky;* for Defenders of Property Rights et al. by *Nancy G. Marzulla;* for the Fire Island Association, Inc., by *Bernard S. Meyer;* for the Institute for Justice by *Richard A. Epstein, William H. Mellor III, Clint Bolick,* and *Jonathan W. Emord;* for the Long Beach Island Oceanfront Homeowners Association et al. by *Theodore J. Carlson;* for the Mountain States Legal Foundation et al. by *William Perry Pendley;* for the National Association of Home Builders et al. by *Michael M. Berger* and *William H. Ethier;* for the Nemours Foundation, Inc., by *John J. Mullenholz;* for the Northern Virginia Chapter of the National Association of Industrial and Office Parks et al. by *John Holland Foote* and *John F. Cahill;* for the Pacific Legal Foundation by *Ronald A. Zumbrun, Edward J. Connor, Jr.,* and *R. S. Radford;* and for the South Carolina Policy Council Education Foundation et al. by *G. Stephen Parker.*

Briefs of *amici curiae* urging affirmance were filed for the State of California by *Daniel E. Lungren,* Attorney General, *Roderick E. Walston,*

JUSTICE SCALIA delivered the opinion of the Court.

In 1986, petitioner David H. Lucas paid $975,000 for two residential lots on the Isle of Palms in Charleston County,

Chief Assistant Attorney General, *Jan S. Stevens,* Assistant Attorney General, *Richard M. Frank* and *Craig C. Thompson,* Supervising Deputy Attorneys General, and *Maria Dante Brown* and *Virna L. Santos,* Deputy Attorneys General; for the State of Florida et al. by *Robert A. Butterworth,* Attorney General of Florida, and *Lewis F. Hubener,* Assistant Attorney General, *James H. Evans,* Attorney General of Alabama, *Richard Blumenthal,* Attorney General of Connecticut, *Charles M. Oberly III,* Attorney General of Delaware, *Michael J. Bowers,* Attorney General of Georgia, *Elizabeth Barrett-Anderson,* Attorney General of Guam, *Warren Price,* Attorney General of Hawaii, *Bonnie J. Campbell,* Attorney General of Iowa, *Michael E. Carpenter,* Attorney General of Maine, *J. Joseph Curran, Jr.,* Attorney General of Maryland, *Scott Harshbarger,* Attorney General of Massachusetts, *Frank J. Kelley,* Attorney General of Michigan, *Hubert H. Humphrey III,* Attorney General of Minnesota, *Frankie Sue Del Papa,* Attorney General of Nevada, *Robert J. Del Tufo,* Attorney General of New Jersey, *John P. Arnold,* Attorney General of New Hampshire, *Tom Udall,* Attorney General of New Mexico, *Robert Abrams,* Attorney General of New York, and *Jerry Boone,* Solicitor General, *Lacy H. Thornburg,* Attorney General of North Carolina, *Charles S. Crookham,* Attorney General of Oregon, *Ernest D. Preate, Jr.,* Attorney General of Pennsylvania, *Jorges Perez-Diaz,* Attorney General of Puerto Rico, *James E. O'Neil,* Attorney General of Rhode Island, *Paul Van Dam,* Attorney General of Utah, *Jeffrey L. Amestoy,* Attorney General of Vermont, *James E. Doyle,* Attorney General of Wisconsin, *Dan Morales,* Attorney General of Texas, and *Brian A. Goldman;* for Broward County et al. by *John J. Copelan, Jr., Herbert W. A. Thiele,* and *H. Hamilton Rice, Jr.;* for California Cities and Counties by *Robin D. Faisant, Gary T. Ragghianti, Manuela Albuquerque, F. Thomas Caporael, William Camil, Scott H. Howard, Roger Picquet, Joseph Barron, David J. Erwin, Charles J. Williams, John Calhoun, Robert K. Booth, Jr., Anthony S. Alperin, Leland H. Jordan, John L. Cook, Jayne Williams, Gary L. Gillig, Dave Larsen, Don G. Kircher, Jean Leonard Harris, Michael F. Dean, John W. Witt, C. Alan Sumption, Joan Gallo, George Rios, Daniel S. Hentschke, Joseph Lawrence, Peter Bulens,* and *Thomas Haas;* for Nueces County, Texas, et al. by *Peter A. A. Berle, Glenn P. Sugameli, Ann Powers,* and *Zygmunt J. B. Plater;* for the American Planning Association et al. by *H. Bissell Carey III* and *Gary A. Owen;* for Members of the National Growth Management Leadership Project by *John A. Humbach;* for the Municipal Art Society of New York,

South Carolina, on which he intended to build single-family homes. In 1988, however, the South Carolina Legislature enacted the Beachfront Management Act, S. C. Code Ann. § 48-39-250 *et seq.* (Supp. 1990), which had the direct effect of barring petitioner from erecting any permanent habitable structures on his two parcels. See § 48-39-290(A). A state trial court found that this prohibition rendered Lucas's parcels "valueless." App. to Pet. for Cert. 37. This case requires us to decide whether the Act's dramatic effect on the economic value of Lucas's lots accomplished a taking of private property under the Fifth and Fourteenth Amendments requiring the payment of "just compensation." U. S. Const., Amdt. 5.

## I

### A

South Carolina's expressed interest in intensively managing development activities in the so-called "coastal zone" dates from 1977 when, in the aftermath of Congress's passage of the federal Coastal Zone Management Act of 1972, 86 Stat. 1280, as amended, 16 U. S. C. § 1451 *et seq.*, the legislature enacted a Coastal Zone Management Act of its own. See S. C. Code Ann. § 48-39-10 *et seq.* (1987). In its original form, the South Carolina Act required owners of coastal zone land that qualified as a "critical area" (defined in the legislation to include beaches and immediately adjacent sand dunes,

Inc., by *William E. Hegarty, Michael S. Gruen, Philip K. Howard, Norman Marcus,* and *Philip Weinberg;* for the National Trust for Historic Preservation in the United States by *Lloyd N. Cutler, Louis R. Cohen, David R. Johnson, Peter B. Hutt II, Jerold S. Kayden, David A. Doheny,* and *Elizabeth S. Merritt;* for the Sierra Club et al. by *Lawrence N. Minch, Laurens H. Silver,* and *Charles M. Chambers;* and for the U. S. Conference of Mayors et al. by *Richard Ruda, Michael G. Dzialo,* and *Barbara Etkind.*

Briefs of *amici curiae* were filed for the National Association of Realtors by *Ralph W. Holmen;* and for the Washington Legal Foundation by *Daniel J. Popeo* and *Paul D. Kamenar.*

§ 48–39–10(J)) to obtain a permit from the newly created South Carolina Coastal Council (Council) (respondent here) prior to committing the land to a "use other than the use the critical area was devoted to on [September 28, 1977]." § 48–39–130(A).

In the late 1970's, Lucas and others began extensive residential development of the Isle of Palms, a barrier island situated eastward of the city of Charleston. Toward the close of the development cycle for one residential subdivision known as "Beachwood East," Lucas in 1986 purchased the two lots at issue in this litigation for his own account. No portion of the lots, which were located approximately 300 feet from the beach, qualified as a "critical area" under the 1977 Act; accordingly, at the time Lucas acquired these parcels, he was not legally obliged to obtain a permit from the Council in advance of any development activity. His intention with respect to the lots was to do what the owners of the immediately adjacent parcels had already done: erect single-family residences. He commissioned architectural drawings for this purpose.

The Beachfront Management Act brought Lucas's plans to an abrupt end. Under that 1988 legislation, the Council was directed to establish a "baseline" connecting the landward-most "point[s] of erosion . . . during the past forty years" in the region of the Isle of Palms that includes Lucas's lots. S. C. Code Ann. § 48–39–280(A)(2) (Supp. 1988).[1] In action not challenged here, the Council fixed this baseline landward of Lucas's parcels. That was significant, for under the Act

---

[1] This specialized historical method of determining the baseline applied because the Beachwood East subdivision is located adjacent to a so-called "inlet erosion zone" (defined in the Act to mean "a segment of shoreline along or adjacent to tidal inlets which are directly influenced by the inlet and its associated shoals," S. C. Code Ann. § 48–39–270(7) (Supp. 1988)) that is "not stabilized by jetties, terminal groins, or other structures," § 48–39–280(A)(2). For areas other than these unstabilized inlet erosion zones, the statute directs that the baseline be established along "the crest of an ideal primary oceanfront sand dune." § 48–39–280(A)(1).

construction of occupable improvements[2] was flatly prohib-
ited seaward of a line drawn 20 feet landward of, and parallel
to, the baseline. § 48–39–290(A). The Act provided no
exceptions.

B

Lucas promptly filed suit in the South Carolina Court of
Common Pleas, contending that the Beachfront Management
Act's construction bar effected a taking of his property with-
out just compensation. Lucas did not take issue with the
validity of the Act as a lawful exercise of South Carolina's
police power, but contended that the Act's complete extin-
guishment of his property's value entitled him to compensa-
tion regardless of whether the legislature had acted in fur-
therance of legitimate police power objectives. Following a
bench trial, the court agreed. Among its factual determina-
tions was the finding that "at the time Lucas purchased the
two lots, both were zoned for single-family residential con-
struction and . . . there were no restrictions imposed upon
such use of the property by either the State of South Caro-
lina, the County of Charleston, or the Town of the Isle of
Palms." App. to Pet. for Cert. 36. The trial court further
found that the Beachfront Management Act decreed a per-
manent ban on construction insofar as Lucas's lots were
concerned, and that this prohibition "deprive[d] Lucas of
any reasonable economic use of the lots, . . . eliminated the
unrestricted right of use, and render[ed] them valueless."
Id., at 37. The court thus concluded that Lucas's properties
had been "taken" by operation of the Act, and it ordered
respondent to pay "just compensation" in the amount of
$1,232,387.50. Id., at 40.

The Supreme Court of South Carolina reversed. It found
dispositive what it described as Lucas's concession "that the

---

[2] The Act did allow the construction of certain nonhabitable improve-
ments, e. g., "wooden walkways no larger in width than six feet," and
"small wooden decks no larger than one hundred forty-four square feet."
§§ 48–39–290(A)(1) and (2).

Beachfront Management Act [was] properly and validly designed to preserve . . . South Carolina's beaches." 304 S. C. 376, 379, 404 S. E. 2d 895, 896 (1991). Failing an attack on the validity of the statute as such, the court believed itself bound to accept the "uncontested . . . findings" of the South Carolina Legislature that new construction in the coastal zone—such as petitioner intended—threatened this public resource. *Id.,* at 383, 404 S. E. 2d, at 898. The court ruled that when a regulation respecting the use of property is designed "to prevent serious public harm," *id.,* at 383, 404 S. E. 2d, at 899 (citing, *inter alia, Mugler* v. *Kansas,* 123 U. S. 623 (1887)), no compensation is owing under the Takings Clause regardless of the regulation's effect on the property's value.

Two justices dissented. They acknowledged that our *Mugler* line of cases recognizes governmental power to prohibit "noxious" uses of property—*i. e.,* uses of property akin to "public nuisances"—without having to pay compensation. But they would not have characterized the Beachfront Management Act's *"primary* purpose [as] the prevention of a nuisance." 304 S. C., at 395, 404 S. E. 2d, at 906 (Harwell, J., dissenting). To the dissenters, the chief purposes of the legislation, among them the promotion of tourism and the creation of a "habitat for indigenous flora and fauna," could not fairly be compared to nuisance abatement. *Id.,* at 396, 404 S. E. 2d, at 906. As a consequence, they would have affirmed the trial court's conclusion that the Act's obliteration of the value of petitioner's lots accomplished a taking.

We granted certiorari. 502 U. S. 966 (1991).

## II

As a threshold matter, we must briefly address the Council's suggestion that this case is inappropriate for plenary review. After briefing and argument before the South Carolina Supreme Court, but prior to issuance of that court's opinion, the Beachfront Management Act was amended to

authorize the Council, in certain circumstances, to issue "special permits" for the construction or reconstruction of habitable structures seaward of the baseline. See S. C. Code Ann. § 48–39–290(D)(1) (Supp. 1991). According to the Council, this amendment renders Lucas's claim of a permanent deprivation unripe, as Lucas may yet be able to secure permission to build on his property. "[The Court's] cases," we are reminded, "uniformly reflect an insistence on knowing the nature and extent of permitted development before adjudicating the constitutionality of the regulations that purport to limit it." *MacDonald, Sommer & Frates* v. *Yolo County,* 477 U. S. 340, 351 (1986). See also *Agins* v. *City of Tiburon,* 447 U. S. 255, 260 (1980). Because petitioner "has not yet obtained a final decision regarding how [he] will be allowed to develop [his] property," *Williamson County Regional Planning Comm'n* v. *Hamilton Bank of Johnson City,* 473 U. S. 172, 190 (1985), the Council argues that he is not yet entitled to definitive adjudication of his takings claim in this Court.

We think these considerations would preclude review had the South Carolina Supreme Court rested its judgment on ripeness grounds, as it was (essentially) invited to do by the Council. See Brief for Respondent 9, n. 3. The South Carolina Supreme Court shrugged off the possibility of further administrative and trial proceedings, however, preferring to dispose of Lucas's takings claim on the merits. Cf., *e. g., San Diego Gas & Electric Co.* v. *San Diego,* 450 U. S. 621, 631–632 (1981). This unusual disposition does not preclude Lucas from applying for a permit under the 1990 amendment for *future* construction, and challenging, on takings grounds, any denial. But it does preclude, both practically and legally, any takings claim with respect to Lucas's *past* deprivation, *i. e.,* for his having been denied construction rights during the period before the 1990 amendment. See generally *First English Evangelical Lutheran Church of Glendale* v. *County of Los Angeles,* 482 U. S. 304 (1987) (holding that

temporary deprivations of use are compensable under the Takings Clause). Without even so much as commenting upon the consequences of the South Carolina Supreme Court's judgment in this respect, the Council insists that permitting Lucas to press his claim of a past deprivation on this appeal would be improper, since "the issues of whether and to what extent [Lucas] has incurred a temporary taking . . . have simply never been addressed." Brief for Respondent 11. Yet Lucas had no reason to proceed on a "temporary taking" theory at trial, or even to seek remand for that purpose prior to submission of the case to the South Carolina Supreme Court, since as the Act then read, the taking was unconditional and permanent. Moreover, given the breadth of the South Carolina Supreme Court's holding and judgment, Lucas would plainly be unable (absent our intervention now) to obtain further state-court adjudication with respect to the 1988–1990 period.

In these circumstances, we think it would not accord with sound process to insist that Lucas pursue the late-created "special permit" procedure before his takings claim can be considered ripe. Lucas has properly alleged Article III injury in fact in this case, with respect to both the pre-1990 and post-1990 constraints placed on the use of his parcels by the Beachfront Management Act.[3] That there is a discre-

---

[3] JUSTICE BLACKMUN insists that this aspect of Lucas's claim is "not justiciable," post, at 1042, because Lucas never fulfilled his obligation under Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City, 473 U. S. 172 (1985), to "submi[t] a plan for development of [his] property" to the proper state authorities, id., at 187. See post, at 1043. But such a submission would have been pointless, as the Council stipulated below that no building permit would have been issued under the 1988 Act, application or no application. Record 14 (stipulations). Nor does the peculiar posture of this case mean that we are without Article III jurisdiction, as JUSTICE BLACKMUN apparently believes. See post, at 1042, and n. 5. Given the South Carolina Supreme Court's dismissive foreclosure of further pleading and adjudication with respect to the pre-1990 component of Lucas's takings claim, it is appropriate for us

tionary "special permit" procedure by which he may regain—for the future, at least—beneficial use of his land goes only to the prudential "ripeness" of Lucas's challenge, and for the reasons discussed we do not think it prudent to apply that prudential requirement here. See *Esposito* v. *South Carolina Coastal Council*, 939 F. 2d 165, 168 (CA4 1991), cert. denied, *post*, p. 1219.[4] We leave for decision on remand, of course, the questions left unaddressed by the South

---

to address that component as if the case were here on the pleadings alone. Lucas properly alleged injury in fact in his complaint. See App. to Pet. for Cert. 154 (complaint); *id.*, at 156 (asking "damages for the temporary taking of his property" from the date of the 1988 Act's passage to "such time as this matter is finally resolved"). No more can reasonably be demanded. Cf. *First English Evangelical Lutheran Church of Glendale* v. *County of Los Angeles*, 482 U. S. 304, 312–313 (1987). JUSTICE BLACKMUN finds it "baffling," *post*, at 1043, n. 5, that we grant standing here, whereas "just a few days ago, in *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555 (1992)," we denied standing. He sees in that strong evidence to support his repeated imputations that the Court "presses" to take this case, *post*, at 1036, is "eager to decide" it, *post*, at 1045, and is unwilling to "be denied," *post*, at 1042. He has a point: The decisions are indeed very close in time, yet one grants standing and the other denies it. The distinction, however, rests in law rather than chronology. *Lujan*, since it involved the establishment of injury in fact at the *summary judgment stage*, required specific facts to be adduced by sworn testimony; had the same challenge to a generalized allegation of injury in fact been made at the pleading stage, it would have been unsuccessful.

[4] In that case, the Court of Appeals for the Fourth Circuit reached the merits of a takings challenge to the 1988 Beachfront Management Act identical to the one Lucas brings here even though the Act was amended, and the special permit procedure established, while the case was under submission. The court observed:

"The enactment of the 1990 Act during the pendency of this appeal, with its provisions for special permits and other changes that may affect the plaintiffs, does not relieve us of the need to address the plaintiffs' claims under the provisions of the 1988 Act. Even if the amended Act cured all of the plaintiffs' concerns, the amendments would not foreclose the possibility that a taking had occurred during the years when the 1988 Act was in effect." *Esposito* v. *South Carolina Coastal Council*, 939 F. 2d 165, 168 (1991).

Carolina Supreme Court as a consequence of its categorical disposition.[5]

### III

### A

Prior to Justice Holmes's exposition in *Pennsylvania Coal Co.* v. *Mahon,* 260 U. S. 393 (1922), it was generally thought that the Takings Clause reached only a "direct appropriation" of property, *Legal Tender Cases,* 12 Wall. 457, 551 (1871), or the functional equivalent of a "practical ouster of [the owner's] possession," *Transportation Co.* v. *Chicago,* 99 U. S. 635, 642 (1879). See also *Gibson* v. *United States,* 166 U. S. 269, 275–276 (1897). Justice Holmes recognized in *Mahon,* however, that if the protection against physical appropriations of private property was to be meaningfully enforced, the government's power to redefine the range of interests included in the ownership of property was necessarily constrained by constitutional limits. 260 U. S., at 414–415. If, instead, the uses of private property were subject to unbridled, uncompensated qualification under the police power, "the natural tendency of human nature [would be] to extend the qualification more and more until at last private property disappear[ed]." *Id.,* at 415. These considerations gave birth in that case to the oft-cited maxim that, "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Ibid.*

---

[5] JUSTICE BLACKMUN states that our "intense interest in Lucas' plight . . . would have been more prudently expressed by vacating the judgment below and remanding for further consideration in light of the 1990 amendments" to the Beachfront Management Act. *Post,* at 1045, n. 7. That is a strange suggestion, given that the South Carolina Supreme Court rendered its categorical disposition in this case *after* the Act had been amended, and *after* it had been invited to consider the effect of those amendments on Lucas's case. We have no reason to believe that the justices of the South Carolina Supreme Court are any more desirous of using a narrower ground now than they were then; and neither "prudence" nor any other principle of judicial restraint requires that we remand to find out whether they have changed their mind.

Nevertheless, our decision in *Mahon* offered little insight into when, and under what circumstances, a given regulation would be seen as going "too far" for purposes of the Fifth Amendment. In 70-odd years of succeeding "regulatory takings" jurisprudence, we have generally eschewed any " 'set formula' " for determining how far is too far, preferring to "engag[e] in . . . essentially ad hoc, factual inquiries." *Penn Central Transportation Co.* v. *New York City*, 438 U. S. 104, 124 (1978) (quoting *Goldblatt* v. *Hempstead*, 369 U. S. 590, 594 (1962)). See Epstein, Takings: Descent and Resurrection, 1987 S. Ct. Rev. 1, 4. We have, however, described at least two discrete categories of regulatory action as compensable without case-specific inquiry into the public interest advanced in support of the restraint. The first encompasses regulations that compel the property owner to suffer a physical "invasion" of his property. In general (at least with regard to permanent invasions), no matter how minute the intrusion, and no matter how weighty the public purpose behind it, we have required compensation. For example, in *Loretto* v. *Teleprompter Manhattan CATV Corp.*, 458 U. S. 419 (1982), we determined that New York's law requiring landlords to allow television cable companies to emplace cable facilities in their apartment buildings constituted a taking, *id.*, at 435–440, even though the facilities occupied at most only 1½ cubic feet of the landlords' property, see *id.*, at 438, n. 16. See also *United States* v. *Causby*, 328 U. S. 256, 265, and n. 10 (1946) (physical invasions of airspace); cf. *Kaiser Aetna* v. *United States*, 444 U. S. 164 (1979) (imposition of navigational servitude upon private marina).

The second situation in which we have found categorical treatment appropriate is where regulation denies all economically beneficial or productive use of land. See *Agins*, 447 U. S., at 260; see also *Nollan* v. *California Coastal Comm'n*, 483 U. S. 825, 834 (1987); *Keystone Bituminous Coal Assn.* v. *DeBenedictis*, 480 U. S. 470, 495 (1987); *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc.*, 452

U. S. 264, 295–296 (1981).[6]  As we have said on numerous occasions, the Fifth Amendment is violated when land-use regulation "does not substantially advance legitimate state interests *or denies an owner economically viable use of his land.*"  *Agins, supra,* at 260 (citations omitted) (emphasis added).[7]

---

[6] We will not attempt to respond to all of JUSTICE BLACKMUN's mistaken citation of case precedent.  Characteristic of its nature is his assertion that the cases we discuss here stand merely for the proposition "that proof that a regulation does *not* deny an owner economic use of his property is sufficient to defeat a facial takings challenge" and not for the point that *"denial* of such use is sufficient to establish a takings claim regardless of any other consideration."  *Post,* at 1050, n. 11.  The cases say, repeatedly and unmistakably, that " '[t]he test to be applied in considering [a] facial [takings] challenge is fairly straightforward.  A statute regulating the uses that can be made of property *effects a taking if it "denies an owner economically viable use of his land." ' "*  *Keystone,* 480 U. S., at 495 (quoting *Hodel,* 452 U. S., at 295–296 (quoting *Agins,* 447 U. S., at 260)) (emphasis added).

JUSTICE BLACKMUN describes that rule (which we do not invent but merely apply today) as "alter[ing] the long-settled rules of review" by foisting on the State "the burden of showing [its] regulation is not a taking."  *Post,* at 1045, 1046.  This is of course wrong.  Lucas had to do more than simply file a lawsuit to establish his constitutional entitlement; he had to show that the Beachfront Management Act denied him economically beneficial use of his land.  Our analysis presumes the unconstitutionality of state land-use regulation only in the sense that *any* rule with exceptions presumes the invalidity of a law that violates it—for example, the rule generally prohibiting content-based restrictions on speech.  See, *e. g., Simon & Schuster, Inc.* v. *Members of N. Y. State Crime Victims Bd.,* 502 U. S. 105, 115 (1991) ("A statute is presumptively inconsistent with the First Amendment if it imposes a financial burden on speakers because of the content of their speech").  JUSTICE BLACKMUN's real quarrel is with the substantive standard of liability we apply in this case, a long-established standard we see no need to repudiate.

[7] Regrettably, the rhetorical force of our "deprivation of all economically feasible use" rule is greater than its precision, since the rule does not make clear the "property interest" against which the loss of value is to be measured.  When, for example, a regulation requires a developer to leave 90% of a rural tract in its natural state, it is unclear whether we would

We have never set forth the justification for this rule. Perhaps it is simply, as Justice Brennan suggested, that total deprivation of beneficial use is, from the landowner's point of view, the equivalent of a physical appropriation. See *San Diego Gas & Electric Co.* v. *San Diego*, 450 U. S., at 652 (dissenting opinion). "[F]or what is the land but the profits thereof[?]" 1 E. Coke, Institutes, ch. 1, §1 (1st Am. ed. 1812). Surely, at least, in the extraordinary circumstance when *no* productive or economically beneficial use of land is permitted, it is less realistic to indulge our usual assumption that the legislature is simply "adjusting the benefits and burdens of economic life," *Penn Central Transportation Co.*, 438

---

analyze the situation as one in which the owner has been deprived of all economically beneficial use of the burdened portion of the tract, or as one in which the owner has suffered a mere diminution in value of the tract as a whole. (For an extreme—and, we think, unsupportable—view of the relevant calculus, see *Penn Central Transportation Co.* v. *New York City*, 42 N. Y. 2d 324, 333–334, 366 N. E. 2d 1271, 1276–1277 (1977), aff'd, 438 U. S. 104 (1978), where the state court examined the diminution in a particular parcel's value produced by a municipal ordinance in light of total value of the takings claimant's other holdings in the vicinity.) Unsurprisingly, this uncertainty regarding the composition of the denominator in our "deprivation" fraction has produced inconsistent pronouncements by the Court. Compare *Pennsylvania Coal Co.* v. *Mahon*, 260 U. S. 393, 414 (1922) (law restricting subsurface extraction of coal held to effect a taking), with *Keystone Bituminous Coal Assn.* v. *DeBenedictis*, 480 U. S. 470, 497–502 (1987) (nearly identical law held not to effect a taking); see also *id.*, at 515–520 (REHNQUIST, C. J., dissenting); Rose, *Mahon* Reconstructed: Why the Takings Issue is Still a Muddle, 57 S. Cal. L. Rev. 561, 566–569 (1984). The answer to this difficult question may lie in how the owner's reasonable expectations have been shaped by the State's law of property—*i. e.*, whether and to what degree the State's law has accorded legal recognition and protection to the particular interest in land with respect to which the takings claimant alleges a diminution in (or elimination of) value. In any event, we avoid this difficulty in the present case, since the "interest in land" that Lucas has pleaded (a fee simple interest) is an estate with a rich tradition of protection at common law, and since the South Carolina Court of Common Pleas found that the Beachfront Management Act left each of Lucas's beachfront lots without economic value.

U. S., at 124, in a manner that secures an "average reciprocity of advantage" to everyone concerned, *Pennsylvania Coal Co.* v. *Mahon,* 260 U. S., at 415. And the *functional* basis for permitting the government, by regulation, to affect property values without compensation—that "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law," *id.,* at 413—does not apply to the relatively rare situations where the government has deprived a landowner of all economically beneficial uses.

On the other side of the balance, affirmatively supporting a compensation requirement, is the fact that regulations that leave the owner of land without economically beneficial or productive options for its use—typically, as here, by requiring land to be left substantially in its natural state—carry with them a heightened risk that private property is being pressed into some form of public service under the guise of mitigating serious public harm. See, *e. g., Annicelli* v. *South Kingstown,* 463 A. 2d 133, 140–141 (R. I. 1983) (prohibition on construction adjacent to beach justified on twin grounds of safety and "conservation of open space"); *Morris County Land Improvement Co.* v. *Parsippany-Troy Hills Township,* 40 N. J. 539, 552–553, 193 A. 2d 232, 240 (1963) (prohibition on filling marshlands imposed in order to preserve region as water detention basin and create wildlife refuge). As Justice Brennan explained: "From the government's point of view, the benefits flowing to the public from preservation of open space through regulation may be equally great as from creating a wildlife refuge through formal condemnation or increasing electricity production through a dam project that floods private property." *San Diego Gas & Elec. Co., supra,* at 652 (dissenting opinion). The many statutes on the books, both state and federal, that

provide for the use of eminent domain to impose servitudes on private scenic lands preventing developmental uses, or to acquire such lands altogether, suggest the practical equivalence in this setting of negative regulation and appropriation. See, *e. g.*, 16 U. S. C. § 410ff–1(a) (authorizing acquisition of "lands, waters, or interests [within Channel Islands National Park] (including but not limited to scenic easements)"); § 460aa–2(a) (authorizing acquisition of "any lands, or lesser interests therein, including mineral interests and scenic easements" within Sawtooth National Recreation Area); §§ 3921–3923 (authorizing acquisition of wetlands); N. C. Gen. Stat. § 113A–38 (1990) (authorizing acquisition of, *inter alia*, "'scenic easements'" within the North Carolina natural and scenic rivers system); Tenn. Code Ann. §§ 11–15–101 to 11–15–108 (1987) (authorizing acquisition of "protective easements" and other rights in real property adjacent to State's historic, architectural, archaeological, or cultural resources).

We think, in short, that there are good reasons for our frequently expressed belief that when the owner of real property has been called upon to sacrifice *all* economically beneficial uses in the name of the common good, that is, to leave his property economically idle, he has suffered a taking.[8]

---

[8] JUSTICE STEVENS criticizes the "deprivation of all economically beneficial use" rule as "wholly arbitrary," in that "[the] landowner whose property is diminished in value 95% recovers nothing," while the landowner who suffers a complete elimination of value "recovers the land's full value." *Post*, at 1064. This analysis errs in its assumption that the landowner whose deprivation is one step short of complete is not entitled to compensation. Such an owner might not be able to claim the benefit of our categorical formulation, but, as we have acknowledged time and again, "[t]he economic impact of the regulation on the claimant and . . . the extent to which the regulation has interfered with distinct investment-backed expectations" are keenly relevant to takings analysis generally. *Penn*

## B

The trial court found Lucas's two beachfront lots to have been rendered valueless by respondent's enforcement of the coastal-zone construction ban.[9] Under Lucas's theory of the case, which rested upon our "no economically viable use" statements, that finding entitled him to compensation. Lucas believed it unnecessary to take issue with either the purposes behind the Beachfront Management Act, or the means chosen by the South Carolina Legislature to effectuate those purposes. The South Carolina Supreme Court, however, thought otherwise. In its view, the Beachfront Management Act was no ordinary enactment, but involved an exercise of South Carolina's "police powers" to mitigate the harm to the public interest that petitioner's use of his

---

*Central Transportation Co.* v. *New York City*, 438 U. S. 104, 124 (1978). It is true that in at least *some* cases the landowner with 95% loss will get nothing, while the landowner with total loss will recover in full. But that occasional result is no more strange than the gross disparity between the landowner whose premises are taken for a highway (who recovers in full) and the landowner whose property is reduced to 5% of its former value by the highway (who recovers nothing). Takings law is full of these "all-or-nothing" situations.

JUSTICE STEVENS similarly misinterprets our focus on "developmental" uses of property (the uses proscribed by the Beachfront Management Act) as betraying an "assumption that the only uses of property cognizable under the Constitution are *developmental* uses." *Post*, at 1065, n. 3. We make no such assumption. Though our prior takings cases evince an abiding concern for the productive use of, and economic investment in, land, there are plainly a number of noneconomic interests in land whose impairment will invite exceedingly close scrutiny under the Takings Clause. See, *e. g., Loretto* v. *Teleprompter Manhattan CATV Corp.*, 458 U. S. 419, 436 (1982) (interest in excluding strangers from one's land).

[9] This finding was the premise of the petition for certiorari, and since it was not challenged in the brief in opposition we decline to entertain the argument in respondent's brief on the merits, see Brief for Respondent 45–50, that the finding was erroneous. Instead, we decide the question presented under the same factual assumptions as did the Supreme Court of South Carolina. See *Oklahoma City* v. *Tuttle*, 471 U. S. 808, 816 (1985).

land might occasion.  304 S. C., at 384, 404 S. E. 2d, at 899. By neglecting to dispute the findings enumerated in the Act[10] or otherwise to challenge the legislature's purposes,

---

[10] The legislature's express findings include the following:

"The General Assembly finds that:

"(1) The beach/dune system along the coast of South Carolina is extremely important to the people of this State and serves the following functions:

"(a) protects life and property by serving as a storm barrier which dissipates wave energy and contributes to shoreline stability in an economical and effective manner;

"(b) provides the basis for a tourism industry that generates approximately two-thirds of South Carolina's annual tourism industry revenue which constitutes a significant portion of the state's economy.  The tourists who come to the South Carolina coast to enjoy the ocean and dry sand beach contribute significantly to state and local tax revenues;

"(c) provides habitat for numerous species of plants and animals, several of which are threatened or endangered.  Waters adjacent to the beach/dune system also provide habitat for many other marine species;

"(d) provides a natural health environment for the citizens of South Carolina to spend leisure time which serves their physical and mental well-being.

"(2) Beach/dune system vegetation is unique and extremely important to the vitality and preservation of the system.

"(3) Many miles of South Carolina's beaches have been identified as critically eroding.

"(4) . . . [D]evelopment unwisely has been sited too close to the [beach/dune] system.  This type of development has jeopardized the stability of the beach/dune system, accelerated erosion, and endangered adjacent property.  It is in both the public and private interests to protect the system from this unwise development.

"(5) The use of armoring in the form of hard erosion control devices such as seawalls, bulkheads, and rip-rap to protect erosion-threatened structures adjacent to the beach has not proven effective.  These armoring devices have given a false sense of security to beachfront property owners.  In reality, these hard structures, in many instances, have increased the vulnerability of beachfront property to damage from wind and waves while contributing to the deterioration and loss of the dry sand beach which is so important to the tourism industry.

"(6) Erosion is a natural process which becomes a significant problem for man only when structures are erected in close proximity to the beach/

petitioner "concede[d] that the beach/dune area of South Carolina's shores is an extremely valuable public resource; that the erection of new construction, *inter alia*, contributes to the erosion and destruction of this public resource; and that discouraging new construction in close proximity to the beach/dune area is necessary to prevent a great public harm." *Id.*, at 382–383, 404 S. E. 2d, at 898. In the court's view, these concessions brought petitioner's challenge within a long line of this Court's cases sustaining against Due Process and Takings Clause challenges the State's use of its "police powers" to enjoin a property owner from activities akin to public nuisances. See *Mugler* v. *Kansas*, 123 U. S. 623 (1887) (law prohibiting manufacture of alcoholic beverages); *Hadacheck* v. *Sebastian*, 239 U. S. 394 (1915) (law barring operation of brick mill in residential area); *Miller* v. *Schoene*, 276 U. S. 272 (1928) (order to destroy diseased cedar trees to prevent infection of nearby orchards); *Goldblatt* v. *Hempstead*, 369 U. S. 590 (1962) (law effectively preventing continued operation of quarry in residential area).

It is correct that many of our prior opinions have suggested that "harmful or noxious uses" of property may be proscribed by government regulation without the requirement of compensation. For a number of reasons, however, we think the South Carolina Supreme Court was too quick to conclude that that principle decides the present case. The "harmful or noxious uses" principle was the Court's early attempt to describe in theoretical terms why government

---

dune system. It is in both the public and private interests to afford the beach/dune system space to accrete and erode in its natural cycle. This space can be provided only by discouraging new construction in close proximity to the beach/dune system and encouraging those who have erected structures too close to the system to retreat from it.

"(8) It is in the state's best interest to protect and to promote increased public access to South Carolina's beaches for out-of-state tourists and South Carolina residents alike." S. C. Code Ann. §48–39–250 (Supp. 1991).

may, consistent with the Takings Clause, affect property values by regulation without incurring an obligation to compensate—a reality we nowadays acknowledge explicitly with respect to the full scope of the State's police power.    See, *e. g.,* *Penn Central Transportation Co.,* 438 U. S., at 125 (where State "reasonably conclude[s] that 'the health, safety, morals, or general welfare' would be promoted by prohibiting particular contemplated uses of land," compensation need not accompany prohibition); see also *Nollan* v. *California Coastal Comm'n,* 483 U. S., at 834–835 ("Our cases have not elaborated on the standards for determining what constitutes a 'legitimate state interest[,]' [but] [t]hey have made clear . . . that a broad range of governmental purposes and regulations satisfy these requirements").    We made this very point in *Penn Central Transportation Co.,* where, in the course of sustaining New York City's landmarks preservation program against a takings challenge, we rejected the petitioner's suggestion that *Mugler* and the cases following it were premised on, and thus limited by, some objective conception of "noxiousness":

> "[T]he uses in issue in *Hadacheck, Miller,* and *Goldblatt* were perfectly lawful in themselves.    They involved no 'blameworthiness, . . . moral wrongdoing or conscious act of dangerous risk-taking which induce[d society] to shift the cost to a pa[rt]icular individual.'    Sax, Takings and the Police Power, 74 Yale L. J. 36, 50 (1964).    These cases are better understood as resting not on any supposed 'noxious' quality of the prohibited uses but rather on the ground that the restrictions were reasonably related to the implementation of a policy—not unlike historic preservation—expected to produce a widespread public benefit and applicable to all similarly situated property."    438 U. S., at 133–134, n. 30.

"Harmful or noxious use" analysis was, in other words, simply the progenitor of our more contemporary statements that

"land-use regulation does not effect a taking if it 'substantially advance[s] legitimate state interests'·...." *Nollan, supra,* at 834 (quoting *Agins* v. *Tiburon,* 447 U. S., at 260); see also *Penn Central Transportation Co., supra,* at 127; *Euclid* v. *Ambler Realty Co.,* 272 U. S. 365, 387–388 (1926).

The transition from our early focus on control of "noxious" uses to our contemporary understanding of the broad realm within which government may regulate without compensation was an easy one, since the distinction between "harm-preventing" and "benefit-conferring" regulation is often in the eye of the beholder. It is quite possible, for example, to describe in *either* fashion the ecological, economic, and esthetic concerns that inspired the South Carolina Legislature in the present case. One could say that imposing a servitude on Lucas's land is necessary in order to prevent his use of it from "harming" South Carolina's ecological resources; or, instead, in order to achieve the "benefits" of an ecological preserve.[11] Compare, *e. g., Claridge* v. *New Hampshire*

---

[11] In the present case, in fact, some of the "[South Carolina] legislature's 'findings'" to which the South Carolina Supreme Court purported to defer in characterizing the purpose of the Act as "harm-preventing," 304 S. C. 376, 385, 404 S. E. 2d 895, 900 (1991), seem to us phrased in "benefit-conferring" language instead. For example, they describe the importance of a construction ban in enhancing "South Carolina's annual tourism industry revenue," S. C. Code Ann. § 48–39–250(1)(b) (Supp. 1991), in "provid-[ing] habitat for numerous species of plants and animals, several of which are threatened or endangered," § 48–39–250(1)(c), and in "provid[ing] a natural healthy environment for the citizens of South Carolina to spend leisure time which serves their physical and mental well-being," § 48–39–250(1)(d). It would be pointless to make the outcome of this case hang upon this terminology, since the same interests could readily be described in "harm-preventing" fashion.

JUSTICE BLACKMUN, however, apparently insists that we *must* make the outcome hinge (exclusively) upon the South Carolina Legislature's other, "harm-preventing" characterizations, focusing on the declaration that "prohibitions on building in front of the setback line are necessary to protect people and property from storms, high tides, and beach erosion." *Post,* at 1040. He says "[n]othing in the record undermines [this] assessment," *ibid.,* apparently seeing no significance in the fact that the statute permits owners of *existing* structures to remain (and even to rebuild

*Wetlands Board,* 125 N. H. 745, 752, 485 A. 2d 237, 292 (1984) (owner may, without compensation, be barred from filling wetlands because landfilling would deprive adjacent coastal habitats and marine fisheries of ecological support), with, *e. g., Bartlett* v. *Zoning Comm'n of Old Lyme,* 161 Conn. 24, 30, 282 A. 2d 907, 910 (1971) (owner barred from filling tidal marshland must be compensated, despite municipality's "laudable" goal of "preserv[ing] marshlands from encroachment or destruction"). Whether one or the other of the competing characterizations will come to one's lips in a particular case depends primarily upon one's evaluation of the worth of competing uses of real estate. See Restatement (Second) of Torts § 822, Comment *g,* p. 112 (1979) ("Practically all human activities unless carried on in a wilderness interfere to some extent with others or involve some risk of interference"). A given restraint will be seen as mitigating "harm" to the adjacent parcels or securing a "benefit" for them, depending upon the observer's evaluation of the relative importance of the use that the restraint favors. See Sax, Takings and the Police Power, 74 Yale L. J. 36, 49 (1964) ("[T]he problem [in this area] is not one of noxiousness or harm-creating activity at all; rather it is a problem of inconsistency between perfectly innocent and independently desirable uses"). Whether Lucas's construction of single-family residences on his parcels should be described as bringing "harm" to South Carolina's adjacent ecological resources thus depends principally upon whether the describer believes that the State's use interest in nurturing those resources is so important that *any* competing adjacent use must yield.[12]

---

if their structures are not "destroyed beyond repair," S. C. Code Ann. § 48–39–290(B) (Supp. 1988)), and in the fact that the 1990 amendment authorizes the Council to issue permits for new construction in violation of the uniform prohibition, see S. C. Code Ann. § 48–39–290(D)(1) (Supp. 1991).

[12] In JUSTICE BLACKMUN's view, even with respect to regulations that deprive an owner of all developmental or economically beneficial land uses,

When it is understood that "prevention of harmful use" was merely our early formulation of the police power justification necessary to sustain (without compensation) *any* regulatory diminution in value; and that the distinction between regulation that "prevents harmful use" and that which "confers benefits" is difficult, if not impossible, to discern on an objective, value-free basis; it becomes self-evident that noxious-use logic cannot serve as a touchstone to distinguish regulatory "takings"—which require compensation—from regulatory deprivations that do not require compensation. *A fortiori* the legislature's recitation of a noxious-use justification cannot be the basis for departing from our categorical rule that total regulatory takings must be compensated. If it were, departure would virtually always be allowed. The South Carolina Supreme Court's approach would essentially nullify *Mahon*'s affirmation of limits to the noncompensable exercise of the police power. Our cases provide no support for this: None of them that employed the logic of "harmful use" prevention to sustain a regulation involved an allegation that the regulation wholly eliminated the value of the claimant's land. See *Keystone Bituminous Coal Assn.*, 480 U. S., at 513–514 (REHNQUIST, C. J., dissenting).[13]

the test for required compensation is whether the legislature has recited a harm-preventing justification for its action. See *post*, at 1039, 1040–1041, 1047–1051. Since such a justification can be formulated in practically every case, this amounts to a test of whether the legislature has a stupid staff. We think the Takings Clause requires courts to do more than insist upon artful harm-preventing characterizations.

[13] *E. g., Mugler* v. *Kansas*, 123 U. S. 623 (1887) (prohibition upon use of a building as a brewery; other uses permitted); *Plymouth Coal Co.* v. *Pennsylvania*, 232 U. S. 531 (1914) (requirement that "pillar" of coal be left in ground to safeguard mine workers; mineral rights could otherwise be exploited); *Reinman* v. *Little Rock*, 237 U. S. 171 (1915) (declaration that livery stable constituted a public nuisance; other uses of the property permitted); *Hadacheck* v. *Sebastian*, 239 U. S. 394 (1915) (prohibition of brick manufacturing in residential area; other uses permitted); *Goldblatt* v. *Hempstead*, 369 U. S. 590 (1962) (prohibition on excavation; other uses permitted).

Where the State seeks to sustain regulation that deprives land of all economically beneficial use, we think it may resist compensation only if the logically antecedent inquiry into the nature of the owner's estate shows that the proscribed use interests were not part of his title to begin with.[14] This accords, we think, with our "takings" jurisprudence, which has traditionally been guided by the understandings of our citizens regarding the content of, and the State's power over, the "bundle of rights" that they acquire when they obtain title to property. It seems to us that the property owner necessarily expects the uses of his property to be restricted, from time to time, by various measures newly enacted by the State in legitimate exercise of its police powers; "[a]s long recognized, some values are enjoyed under an implied limitation and must yield to the police power." *Pennsylvania Coal Co.* v. *Mahon*, 260 U. S., at 413. And in the case of personal property, by reason of the State's traditionally high degree of control over commercial dealings, he ought to be aware of the possibility that new regulation might even ren-

---

[14] Drawing on our First Amendment jurisprudence, see, *e. g.*, *Employment Div., Dept. of Human Resources of Ore.* v. *Smith*, 494 U. S. 872, 878–879 (1990), JUSTICE STEVENS would "loo[k] to the *generality* of a regulation of property" to determine whether compensation is owing. *Post*, at 1072. The Beachfront Management Act is general, in his view, because it "regulates the use of the coastline of the entire State." *Post*, at 1074. There may be some validity to the principle JUSTICE STEVENS proposes, but it does not properly apply to the present case. The equivalent of a law of general application that inhibits the practice of religion without being aimed at religion, see *Oregon* v. *Smith, supra*, is a law that destroys the value of land without being aimed at land. Perhaps such a law—the generally applicable criminal prohibition on the manufacturing of alcoholic beverages challenged in *Mugler* comes to mind—cannot constitute a compensable taking. See 123 U. S., at 655–656. But a regulation *specifically directed to land use* no more acquires immunity by plundering landowners generally than does a law specifically directed at religious practice acquire immunity by prohibiting all religions. JUSTICE STEVENS's approach renders the Takings Clause little more than a particularized restatement of the Equal Protection Clause.

der his property economically worthless (at least if the property's only economically productive use is sale or manufacture for sale). See *Andrus* v. *Allard*, 444 U. S.. 51, 66–67 (1979) (prohibition on sale of eagle feathers). In the case of land, however, we think the notion pressed by the Council that title is somehow held subject to the "implied limitation" that the State may subsequently eliminate all economically valuable use is inconsistent with the historical compact recorded in the Takings Clause that has become part of our constitutional culture.[15]

Where "permanent physical occupation" of land is concerned, we have refused to allow the government to decree it anew (without compensation), no matter how weighty the asserted "public interests" involved, *Loretto* v. *Teleprompter Manhattan CATV Corp.*, 458 U. S., at 426—though we assuredly *would* permit the government to assert a permanent easement that was a pre-existing limitation upon the land-

---

[15] After accusing us of "launch[ing] a missile to kill a mouse," *post*, at 1036, JUSTICE BLACKMUN expends a good deal of throw-weight of his own upon a noncombatant, arguing that our description of the "understanding" of land ownership that informs the Takings Clause is not supported by early American experience. That is largely true, but entirely irrelevant. The practices of the States *prior* to incorporation of the Takings and Just Compensation Clauses, see *Chicago, B. & Q. R. Co.* v. *Chicago*, 166 U. S. 226 (1897)—which, as JUSTICE BLACKMUN acknowledges, occasionally included *outright physical appropriation* of land without compensation, see *post*, at 1056—were out of accord with *any* plausible interpretation of those provisions. JUSTICE BLACKMUN is correct that early constitutional theorists did not believe the Takings Clause embraced regulations of property at all, see *post*, at 1057–1058, and n. 23, but even he does not suggest (explicitly, at least) that we renounce the Court's contrary conclusion in *Mahon.* Since the text of the Clause can be read to encompass regulatory as well as physical deprivations (in contrast to the text originally proposed by Madison, see Speech Proposing Bill of Rights (June 8, 1789), in 12 J. Madison, The Papers of James Madison 201 (C. Hobson, R. Rutland, W. Rachal, & J. Sisson ed. 1979) ("No person shall be . . . obliged to relinquish his property', where it may be necessary for public use, without a just compensation"), we decline to do so as well.

owner's title.  Compare *Scranton* v. *Wheeler*, 179 U. S. 141, 163 (1900) (interests of "riparian owner in the submerged lands . . . bordering on a public navigable water" held subject to Government's navigational servitude), with *Kaiser Aetna* v. *United States*, 444 U. S., at 178–180 (imposition of navigational servitude on marina created and rendered navigable at private expense held to constitute a taking).  We believe similar treatment must be accorded confiscatory regulations, *i. e.*, regulations that prohibit all economically beneficial use of land: Any limitation so severe cannot be newly legislated or decreed (without compensation), but must inhere in the title itself, in the restrictions that background principles of the State's law of property and nuisance already place upon land ownership.  A law or decree with such an effect must, in other words, do no more than duplicate the result that could have been achieved in the courts—by adjacent landowners (or other uniquely affected persons) under the State's law of private nuisance, or by the State under its complementary power to abate nuisances that affect the public generally, or otherwise.[16]

On this analysis, the owner of a lakebed, for example, would not be entitled to compensation when he is denied the requisite permit to engage in a landfilling operation that would have the effect of flooding others' land.  Nor the corporate owner of a nuclear generating plant, when it is directed to remove all improvements from its land upon discovery that the plant sits astride an earthquake fault.  Such regulatory action may well have the effect of eliminating the land's only economically productive use, but it does not proscribe a productive use that was previously permissible

---

[16] The principal "otherwise" that we have in mind is litigation absolving the State (or private parties) of liability for the destruction of "real and personal property, in cases of actual necessity, to prevent the spreading of a fire" or to forestall other grave threats to the lives and property of others.  *Bowditch* v. *Boston*, 101 U. S. 16, 18–19 (1880); see *United States* v. *Pacific R. Co.*, 120 U. S. 227, 238–239 (1887).

under relevant property and nuisance principles. The use of these properties for what are now expressly prohibited purposes was *always* unlawful, and (subject to other constitutional limitations) it was open to the State at any point to make the implication of those background principles of nuisance and property law explicit. See Michelman, Property, Utility, and Fairness, Comments on the Ethical Foundations of "Just Compensation" Law, 80 Harv. L. Rev. 1165, 1239–1241 (1967). In light of our traditional resort to "existing rules or understandings that stem from an independent source such as state law" to define the range of interests that qualify for protection as "property" under the Fifth and Fourteenth Amendments, *Board of Regents of State Colleges* v. *Roth,* 408 U. S. 564, 577 (1972); see, *e. g., Ruckelshaus* v. *Monsanto Co.,* 467 U. S. 986, 1011–1012 (1984); *Hughes* v. *Washington,* 389 U. S. 290, 295 (1967) (Stewart, J., concurring), this recognition that the Takings Clause does not require compensation when an owner is barred from putting land to a use that is proscribed by those "existing rules or understandings" is surely unexceptional. When, however, a regulation that declares "off-limits" all economically productive or beneficial uses of land goes beyond what the relevant background principles would dictate, compensation must be paid to sustain it.[17]

The "total taking" inquiry we require today will ordinarily entail (as the application of state nuisance law ordinarily entails) analysis of, among other things, the degree of harm to public lands and resources, or adjacent private property,

---

[17] Of course, the State may elect to rescind its regulation and thereby avoid having to pay compensation for a permanent deprivation. See *First English Evangelical Lutheran Church,* 482 U. S., at 321. But "where the [regulation has] already worked a taking of all use of property, no subsequent action by the government can relieve it of the duty to provide compensation for the period during which the taking was effective." *Ibid.*

posed by the claimant's proposed activities, see, *e. g.*, Restatement (Second) of Torts §§ 826, 827, the social value of the claimant's activities and their suitability to the locality in question, see, *e. g.*, *id.*, §§ 828(a) and (b), 831, and the relative ease with which the alleged harm can be avoided through measures taken by the claimant and the government (or adjacent private landowners) alike, see, *e. g.*, *id.*, §§ 827(e), 828(c), 830. The fact that a particular use has long been engaged in by similarly situated owners ordinarily imports a lack of any common-law prohibition (though changed circumstances or new knowledge may make what was previously permissible no longer so, see *id.*, § 827, Comment *g*. So also does the fact that other landowners, similarly situated, are permitted to continue the use denied to the claimant.

It seems unlikely that common-law principles would have prevented the erection of any habitable or productive improvements on petitioner's land; they rarely support prohibition of the "essential use" of land, *Curtin* v. *Benson*, 222 U. S. 78, 86 (1911). The question, however, is one of state law to be dealt with on remand. We emphasize that to win its case South Carolina must do more than proffer the legislature's declaration that the uses Lucas desires are inconsistent with the public interest, or the conclusory assertion that they violate a common-law maxim such as *sic utere tuo ut alienum non laedas*. As we have said, a "State, by *ipse dixit*, may not transform private property into public property without compensation . . . ." *Webb's Fabulous Pharmacies, Inc.* v. *Beckwith*, 449 U. S. 155, 164 (1980). Instead, as it would be required to do if it sought to restrain Lucas in a common-law action for public nuisance, South Carolina must identify background principles of nuisance and property law that prohibit the uses he now intends in the circumstances in which the property is presently found. Only on this showing can

the State fairly claim that, in proscribing all such beneficial uses, the Beachfront Management Act is taking nothing.[18]

\*　　\*　　\*

The judgment is reversed, and the case is remanded for proceedings not inconsistent with this opinion.

*So ordered.*

JUSTICE KENNEDY, concurring in the judgment.

The case comes to the Court in an unusual posture, as all my colleagues observe. *Ante,* at 1010–1011; *post,* at 1041 (BLACKMUN, J., dissenting); *post,* at 1061–1062 (STEVENS, J., dissenting); *post,* at 1076–1077 (statement of SOUTER, J.). After the suit was initiated but before it reached us, South Carolina amended its Beachfront Management Act to authorize the issuance of special permits at variance with the Act's general limitations. See S. C. Code Ann. § 48–39–290(D)(1) (Supp. 1991). Petitioner has not applied for a special permit but may still do so. The availability of this alternative, if it can be invoked, may dispose of petitioner's claim of a permanent taking. As I read the Court's opinion, it does not decide the permanent taking claim, but neither does it foreclose the Supreme Court of South Carolina from considering the claim or requiring petitioner to pursue an administrative alternative not previously available.

The potential for future relief does not control our disposition, because whatever may occur in the future cannot undo

---

[18] JUSTICE BLACKMUN decries our reliance on background nuisance principles at least in part because he believes those principles to be as manipulable as we find the "harm prevention"/"benefit conferral" dichotomy, see *post,* at 1054–1055. There is no doubt some leeway in a court's interpretation of what existing state law permits—but not remotely as much, we think, as in a legislative crafting of the reasons for its confiscatory regulation. We stress that an affirmative decree eliminating all economically beneficial uses may be defended only if an *objectively reasonable application* of relevant precedents would exclude those beneficial uses in the circumstances in which the land is presently found.

what has occurred in the past. The Beachfront Management Act was enacted in 1988. S. C. Code Ann. § 48–39–250 *et seq.* (Supp. 1990). It may have deprived petitioner of the use of his land in an interim period. § 48–39–290(A). If this deprivation amounts to a taking, its limited duration will not bar constitutional relief. It is well established that temporary takings are as protected by the Constitution as are permanent ones. *First English Evangelical Lutheran Church of Glendale* v. *County of Los Angeles,* 482 U. S. 304, 318 (1987).

The issues presented in the case are ready for our decision. The Supreme Court of South Carolina decided the case on constitutional grounds, and its rulings are now before us. There exists no jurisdictional bar to our disposition, and prudential considerations ought not to militate against it. The State cannot complain of the manner in which the issues arose. Any uncertainty in this regard is attributable to the State, as a consequence of its amendment to the Beachfront Management Act. If the Takings Clause is to protect against temporary deprivations, as well as permanent ones, its enforcement must not be frustrated by a shifting background of state law.

Although we establish a framework for remand, moreover, we do not decide the ultimate question whether a temporary taking has occurred in this case. The facts necessary to the determination have not been developed in the record. Among the matters to be considered on remand must be whether petitioner had the intent and capacity to develop the property and failed to do so in the interim period because the State prevented him. Any failure by petitioner to comply with relevant administrative requirements will be part of that analysis.

The South Carolina Court of Common Pleas found that petitioner's real property has been rendered valueless by the State's regulation. App. to Pet. for Cert. 37. The finding appears to presume that the property has no significant mar-

ket value or resale potential. This is a curious finding, and I share the reservations of some of my colleagues about a finding that a beachfront lot loses all value because of a development restriction. *Post*, at 1043–1045 (BLACKMUN, J., dissenting); *post*, at 1065, n. 3 (STEVENS, J., dissenting); *post*, at 1076 (statement of SOUTER, J.). While the Supreme Court of South Carolina on remand need not consider the case subject to this constraint, we must accept the finding as entered below. See *Oklahoma City* v. *Tuttle*, 471 U. S. 808, 816 (1985). Accepting the finding as entered, it follows that petitioner is entitled to invoke the line of cases discussing regulations that deprive real property of all economic value. See *Agins* v. *City of Tiburon*, 447 U. S. 255, 260 (1980).

The finding of no value must be considered under the Takings Clause by reference to the owner's reasonable, investment-backed expectations. *Kaiser Aetna* v. *United States*, 444 U. S. 164, 175 (1979); *Penn Central Transportation Co.* v. *New York City*, 438 U. S. 104, 124 (1978); see also *W. B. Worthen Co.* v. *Kavanaugh*, 295 U. S. 56 (1935). The Takings Clause, while conferring substantial protection on property owners, does not eliminate the police power of the State to enact limitations on the use of their property. *Mugler* v. *Kansas*, 123 U. S. 623, 669 (1887). The rights conferred by the Takings Clause and the police power of the State may coexist without conflict. Property is bought and sold, investments are made, subject to the State's power to regulate. Where a taking is alleged from regulations which deprive the property of all value, the test must be whether the deprivation is contrary to reasonable, investment-backed expectations.

There is an inherent tendency towards circularity in this synthesis, of course; for if the owner's reasonable expectations are shaped by what courts allow as a proper exercise of governmental authority, property tends to become what courts say it is. Some circularity must be tolerated in these matters, however, as it is in other spheres. *E. g., Katz* v.

*United States,* 389 U. S. 347 (1967) (Fourth Amendment protections defined by reasonable expectations of privacy). The definition, moreover, is not circular in its entirety. The expectations protected by the Constitution are based on objective rules and customs that can be understood as reasonable by all parties involved.

In my view, reasonable expectations must be understood in light of the whole of our legal tradition. The common law of nuisance is too narrow a confine for the exercise of regulatory power in a complex and interdependent society. *Goldblatt* v. *Hempstead,* 369 U. S. 590, 593 (1962). The State should not be prevented from enacting new regulatory initiatives in response to changing conditions, and courts must consider all reasonable expectations whatever their source. The Takings Clause does not require a static body of state property law; it protects private expectations to ensure private investment. I agree with the Court that nuisance prevention accords with the most common expectations of property owners who face regulation, but I do not believe this can be the sole source of state authority to impose severe restrictions. Coastal property may present such unique concerns for a fragile land system that the State can go further in regulating its development and use than the common law of nuisance might otherwise permit.

The Supreme Court of South Carolina erred, in my view, by reciting the general purposes for which the state regulations were enacted without a determination that they were in accord with the owner's reasonable expectations and therefore sufficient to support a severe restriction on specific parcels of property. See 304 S. C. 376, 383, 404 S. E. 2d 895, 899 (1991). The promotion of tourism, for instance, ought not to suffice to deprive specific property of all value without a corresponding duty to compensate. Furthermore, the means, as well as the ends, of regulation must accord with the owner's reasonable expectations. Here, the State did not act until after the property had been zoned for individual

lot development and most other parcels had been improved, throwing the whole burden of the regulation on the remaining lots. This too must be measured in the balance. See *Pennsylvania Coal Co.* v. *Mahon,* 260 U. S. 393, 416 (1922).

With these observations, I concur in the judgment of the Court.

JUSTICE BLACKMUN, dissenting.

Today the Court launches a missile to kill a mouse.

The State of South Carolina prohibited petitioner Lucas from building a permanent structure on his property from 1988 to 1990. Relying on an unreviewed (and implausible) state trial court finding that this restriction left Lucas' property valueless, this Court granted review to determine whether compensation must be paid in cases where the State prohibits all economic use of real estate. According to the Court, such an occasion never has arisen in any of our prior cases, and the Court imagines that it will arise "relatively rarely" or only in "extraordinary circumstances." Almost certainly it did not happen in this case.

Nonetheless, the Court presses on to decide the issue, and as it does, it ignores its jurisdictional limits, remakes its traditional rules of review, and creates simultaneously a new categorical rule and an exception (neither of which is rooted in our prior case law, common law, or common sense). I protest not only the Court's decision, but each step taken to reach it. More fundamentally, I question the Court's wisdom in issuing sweeping new rules to decide such a narrow case. Surely, as JUSTICE KENNEDY demonstrates, the Court could have reached the result it wanted without inflicting this damage upon our Takings Clause jurisprudence.

My fear is that the Court's new policies will spread beyond the narrow confines of the present case. For that reason, I, like the Court, will give far greater attention to this case than its narrow scope suggests—not because I can intercept

the Court's missile, or save the targeted mouse, but because I hope perhaps to limit the collateral damage.

## I

## A

In 1972 Congress passed the Coastal Zone Management Act. 16 U. S. C. § 1451 *et seq.* The Act was designed to provide States with money and incentives to carry out Congress' goal of protecting the public from shoreline erosion and coastal hazards. In the 1980 amendments to the Act, Congress directed States to enhance their coastal programs by "[p]reventing or significantly reducing threats to life and the destruction of property by eliminating development and redevelopment in high-hazard areas."[1]   16 U. S. C. § 1456b(a)(2) (1988 ed., Supp. II).

South Carolina began implementing the congressional directive by enacting the South Carolina Coastal Zone Management Act of 1977.  Under the 1977 Act, any construction activity in what was designated the "critical area" required a permit from the South Carolina Coastal Council (Council), and the construction of any habitable structure was prohibited.  The 1977 critical area was relatively narrow.

This effort did not stop the loss of shoreline.  In October 1986, the Council appointed a "Blue Ribbon Committee on Beachfront Management" to investigate beach erosion and

[1] The country has come to recognize that uncontrolled beachfront development can cause serious damage to life and property.  See Brief for Sierra Club et al. as *Amici Curiae* 2–5.  Hurricane Hugo's September 1989 attack upon South Carolina's coastline, for example, caused 29 deaths and approximately $6 billion in property damage, much of it the result of uncontrolled beachfront development.  See Zalkin, Shifting Sands and Shifting Doctrines: The Supreme Court's Changing Takings Doctrine and South Carolina's Coastal Zone Statute, 79 Calif. L. Rev. 205, 212–213 (1991).  The beachfront buildings are not only themselves destroyed in such a storm, "but they are often driven, like battering rams, into adjacent inland homes." *Ibid.* Moreover, the development often destroys the natural sand dune barriers that provide storm breaks. *Ibid.*

propose possible solutions. In March 1987, the Committee found that South Carolina's beaches were "critically eroding," and proposed land-use restrictions. Report of the South Carolina Blue Ribbon Committee on Beachfront Management i, 6–10 (Mar. 1987). In response, South Carolina enacted the Beachfront Management Act on July 1, 1988. S. C. Code Ann. § 48–39–250 *et seq.* (Supp. 1990). The 1988 Act did not change the uses permitted within the designated critical areas. Rather, it enlarged those areas to encompass the distance from the mean high watermark to a setback line established on the basis of "the best scientific and historical data" available.[2] S. C. Code Ann. § 48–39–280 (Supp. 1991).

### B

Petitioner Lucas is a contractor, manager, and part owner of the Wild Dune development on the Isle of Palms. He has lived there since 1978. In December 1986, he purchased two of the last four pieces of vacant property in the development.[3] The area is notoriously unstable. In roughly half of the last 40 years, all or part of petitioner's property was part of the beach or flooded twice daily by the ebb and flow of the tide. Tr. 84. Between 1957 and 1963, petitioner's property was under water. *Id.*, at 79, 81–82. Between 1963 and 1973 the shoreline was 100 to 150 feet onto petitioner's property. *Ibid.* In 1973 the first line of stable vegetation was about halfway through the property. *Id.*, at 80. Between 1981 and 1983, the Isle of Palms issued 12 emergency orders for

---

[2] The setback line was determined by calculating the distance landward from the crest of an ideal oceanfront sand dune which is 40 times the annual erosion rate. S. C. Code Ann. § 48–39–280 (Supp. 1991).

[3] The properties were sold frequently at rapidly escalating prices before Lucas purchased them. Lot 22 was first sold in 1979 for $96,660, sold in 1984 for $187,500, then in 1985 for $260,000, and, finally, to Lucas in 1986 for $475,000. He estimated its worth in 1991 at $650,000. Lot 24 had a similar past. The record does not indicate who purchased the properties prior to Lucas, or why none of the purchasers held on to the lots and built on them. Tr. 44–46.

sandbagging to protect property in the Wild Dune development. *Id.*, at 99. Determining that local habitable structures were in imminent danger of collapse, the Council issued permits for two rock revetments to protect condominium developments near petitioner's property from erosion; one of the revetments extends more than halfway onto one of his lots. *Id.*, at 102.

## C

The South Carolina Supreme Court found that the Beachfront Management Act did not take petitioner's property without compensation. The decision rested on two premises that until today were unassailable—that the State has the power to prevent any use of property it finds to be harmful to its citizens, and that a state statute is entitled to a presumption of constitutionality.

The Beachfront Management Act includes a finding by the South Carolina General Assembly that the beach/dune system serves the purpose of "protect[ing] life and property by serving as a storm barrier which dissipates wave energy and contributes to shoreline stability in an economical and effective manner." S. C. Code Ann. § 48–39–250(1)(a) (Supp. 1990). The General Assembly also found that "development unwisely has been sited too close to the [beach/dune] system. This type of development has jeopardized the stability of the beach/dune system, accelerated erosion, and endangered adjacent property." § 48–39–250(4); see also § 48–39–250(6) (discussing the need to "afford the beach/dune system space to accrete and erode").

If the state legislature is correct that the prohibition on building in front of the setback line prevents serious harm, then, under this Court's prior cases, the Act is constitutional. "Long ago it was recognized that all property in this country is held under the implied obligation that the owner's use of it shall not be injurious to the community, and the Takings Clause did not transform that principle to one that requires compensation whenever the State asserts its power to en-

force it." *Keystone Bituminous Coal Assn.* v. *DeBenedictis*, 480 U. S. 470, 491–492 (1987) (internal quotation marks omitted); see also *id.,* at 488–489, and n. 18. The Court consistently has upheld regulations imposed to arrest a significant threat to the common welfare, whatever their economic effect on the owner. See, *e. g., Goldblatt* v. *Hempstead,* 369 U. S. 590, 592–593 (1962); *Euclid* v. *Ambler Realty Co.,* 272 U. S. 365 (1926); *Gorieb* v. *Fox,* 274 U. S. 603, 608 (1927); *Mugler* v. *Kansas,* 123 U. S. 623 (1887).

Petitioner never challenged the legislature's findings that a building ban was necessary to protect property and life. Nor did he contend that the threatened harm was not sufficiently serious to make building a house in a particular location a "harmful" use, that the legislature had not made sufficient findings, or that the legislature was motivated by anything other than a desire to minimize damage to coastal areas. Indeed, petitioner objected at trial that evidence as to the purposes of the setback requirement was irrelevant. Tr. 68. The South Carolina Supreme Court accordingly understood petitioner not to contest the State's position that "discouraging new construction in close proximity to the beach/dune area is necessary to prevent a great public harm," 304 S. C. 376, 383, 404 S. E. 2d 895, 898 (1991), and "to prevent serious injury to the community." *Id.,* at 387, 404 S. E. 2d, at 901. The court considered itself "bound by these uncontested legislative findings . . . [in the absence of] any attack whatsoever on the statutory scheme." *Id.,* at 383, 404 S. E. 2d, at 898.

Nothing in the record undermines the General Assembly's assessment that prohibitions on building in front of the setback line are necessary to protect people and property from storms, high tides, and beach erosion. Because that legislative determination cannot be disregarded in the absence of such evidence, see, *e. g., Euclid,* 272 U. S., at 388; *O'Gorman & Young, Inc.* v. *Hartford Fire Ins. Co.,* 282 U. S. 251, 257–258 (1931) (Brandeis, J.), and because its determination

 

of harm to life and property from building is sufficient to prohibit that use under this Court's cases, the South Carolina Supreme Court correctly found no taking.

## II

My disagreement with the Court begins with its decision to review this case. This Court has held consistently that a land-use challenge is not ripe for review until there is a final decision about what uses of the property will be permitted. The ripeness requirement is not simply a gesture of good will to land-use planners. In the absence of "a final and authoritative determination of the type and intensity of development legally permitted on the subject property," *MacDonald, Sommer & Frates* v. *Yolo County,* 477 U. S. 340, 348 (1986), and the utilization of state procedures for just compensation, there is no final judgment, and in the absence of a final judgment there is no jurisdiction, see *San Diego Gas & Electric Co.* v. *San Diego,* 450 U. S. 621, 633 (1981); *Agins* v. *City of Tiburon,* 447 U. S. 255, 260 (1980).

This rule is "compelled by the very nature of the inquiry required by the Just Compensation Clause," because the factors applied in deciding a takings claim "simply cannot be evaluated until the administrative agency has arrived at a final, definitive position regarding how it will apply the regulations at issue to the particular land in question." *Williamson County Regional Planning Comm'n* v. *Hamilton Bank of Johnson City,* 473 U. S. 172, 190, 191 (1985). See also *MacDonald, Sommer & Frates,* 477 U. S., at 348 ("A court cannot determine whether a regulation has gone 'too far' unless it knows how far the regulation goes") (citation omitted).

The Court admits that the 1990 amendments to the Beachfront Management Act allowing special permits preclude Lucas from asserting that his property has been permanently taken. See *ante,* at 1011–1012. The Court agrees that such a claim would not be ripe because there has been no final decision by respondent on what uses will be permitted.

The Court, however, will not be denied: It determines that petitioner's "temporary takings" claim for the period from July 1, 1988, to June 25, 1990, is ripe. But this claim also is not justiciable.[4]

From the very beginning of this litigation, respondent has argued that the courts

> "lac[k] jurisdiction in this matter because the Plaintiff has sought no authorization from Council for use of his property, has not challenged the location of the baseline or setback line as alleged in the Complaint and because no final agency decision has been rendered concerning use of his property or location of said baseline or setback line." Tr. 10 (answer, as amended).

Although the Council's plea has been ignored by every court, it is undoubtedly correct.

Under the Beachfront Management Act, petitioner was entitled to challenge the setback line or the baseline or erosion rate applied to his property in formal administrative, followed by judicial, proceedings. S. C. Code Ann. § 48–39–280(E) (Supp. 1991). Because Lucas failed to pursue this administrative remedy, the Council never finally decided whether Lucas' particular piece of property was correctly categorized as a critical area in which building would not be permitted. This is all the more crucial because Lucas argued strenuously in the trial court that his land was perfectly safe to build on, and that his company had studies to prove it. Tr. 20, 25, 36. If he was correct, the Council's

---

[4]The Court's reliance, *ante*, at 1013, on *Esposito* v. *South Carolina Coastal Council*, 939 F. 2d 165, 168 (CA4 1991), cert. denied, *post*, p. 1219, in support of its decision to consider Lucas' temporary takings claim ripe is misplaced. In *Esposito* the plaintiffs brought a facial challenge to the mere enactment of the Act. Here, of course, Lucas has brought an as-applied challenge. See Brief for Petitioner 16. Facial challenges are ripe when the Act is passed; applied challenges require a final decision on the Act's application to the property in question.

final decision would have been to alter the setback line, eliminating the construction ban on Lucas' property.

That petitioner's property fell within the critical area as initially interpreted by the Council does not excuse petitioner's failure to challenge the Act's application to his property in the administrative process. The claim is not ripe until petitioner seeks a variance from that status. "[W]e have made it quite clear that the mere assertion of regulatory jurisdiction by a governmental body does not constitute a regulatory taking." *United States* v. *Riverside Bayview Homes, Inc.*, 474 U. S. 121, 126 (1985). See also *Williamson County*, 473 U. S., at 188 (claim not ripe because respondent did not seek variances that would have allowed it to develop the property, notwithstanding the commission's finding that the plan did not comply with the zoning ordinance and subdivision regulations).[5]

Even if I agreed with the Court that there were no jurisdictional barriers to deciding this case, I still would not try to decide it. The Court creates its new takings jurisprudence based on the trial court's finding that the property

---

[5] Even more baffling, given its decision, just a few days ago, in *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555 (1992), the Court decides petitioner has demonstrated injury in fact. In his complaint, petitioner made no allegations that he had any definite plans for using his property. App. to Pet. for Cert. 153–156. At trial, Lucas testified that he had house plans drawn up, but that he was "in no hurry" to build "because the lot was appreciating in value." Tr. 28–29. The trial court made no findings of fact that Lucas had any plans to use the property from 1988 to 1990. "'[S]ome day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require." 504 U. S., at 564. The Court circumvents *Defenders of Wildlife* by deciding to resolve this case as if it arrived on the pleadings alone. But it did not. Lucas had a full trial on his claim for "'damages for the temporary taking of his property' from the date of the 1988 Act's passage to 'such time as this matter is finally resolved,'" *ante*, at 1013, n. 3, quoting the complaint, and failed to demonstrate any immediate concrete plans to build or sell.

had lost all economic value.[6]   This finding is almost certainly
erroneous.   Petitioner still can enjoy other attributes of
ownership, such as the right to exclude others, "one of the
most essential sticks in the bundle of rights that are com-
monly characterized as property." *Kaiser Aetna* v. *United
States*, 444 U. S. 164, 176 (1979).   Petitioner can picnic, swim,
camp in a tent, or live on the property in a movable trailer.
State courts frequently have recognized that land has eco-
nomic value where the only residual economic uses are recre-
ation or camping.   See, *e. g.*, *Turnpike Realty Co.* v. *Ded-
ham*, 362 Mass. 221, 284 N. E. 2d 891 (1972); *Turner* v.
*County of Del Norte*, 24 Cal. App. 3d 311, 101 Cal. Rptr. 93
(1972), cert. denied, 409 U. S. 1108 (1973); *Hall* v. *Board of
Environmental Protection*, 528 A. 2d 453 (Me. 1987).   Peti-
tioner also retains the right to alienate the land, which would
have value for neighbors and for those prepared to enjoy
proximity to the ocean without a house.

Yet the trial court, apparently believing that "less value"
and "valueless" could be used interchangeably, found the
property "valueless."   The court accepted no evidence from
the State on the property's value without a home, and peti-
tioner's appraiser testified that he never had considered
what the value would be absent a residence.   Tr. 54–55.
The appraiser's value was based on the fact that the "highest
and best use of these lots . . . [is] luxury single family de-
tached dwellings."   *Id.*, at 48.   The trial court appeared to
believe that the property could be considered "valueless" if
it was not available for its most profitable use.   Absent that
erroneous assumption, see *Goldblatt*, 369 U. S., at 592, I find
no evidence in the record supporting the trial court's conclu-
sion that the damage to the lots by virtue of the restrictions

---

[6] Respondent contested the findings of fact of the trial court in the South
Carolina Supreme Court, but that court did not resolve the issue.   This
Court's decision to assume for its purposes that petitioner had been denied
all economic use of his land does not, of course, dispose of the issue on
remand.

was "total." Record 128 (findings of fact). I agree with the Court, *ante*, at 1020, n. 9, that it has the power to decide a case that turns on an erroneous finding, but I question the wisdom of deciding an issue based on a factual premise that does not exist in this case, and in the judgment of the Court will exist in the future only in "extraordinary circumstance[s]," *ante*, at 1017.

Clearly, the Court was eager to decide this case.[7] But eagerness, in the absence of proper jurisdiction, must—and in this case should have been—met with restraint.

## III

The Court's willingness to dispense with precedent in its haste to reach a result is not limited to its initial jurisdictional decision. The Court also alters the long-settled rules of review.

The South Carolina Supreme Court's decision to defer to legislative judgments in the absence of a challenge from petitioner comports with one of this Court's oldest maxims: "[T]he existence of facts supporting the legislative judgment is to be presumed." *United States* v. *Carolene Products Co.*, 304 U. S. 144, 152 (1938). Indeed, we have said the legislature's judgment is "well-nigh conclusive." *Berman* v. *Par-*

---

[7] The Court overlooks the lack of a ripe and justiciable claim apparently out of concern that in the absence of its intervention Lucas will be unable to obtain further adjudication of his temporary takings claim. The Court chastises respondent for arguing that Lucas' temporary takings claim is premature because it failed "so much as [to] commen[t]" upon the effect of the South Carolina Supreme Court's decision on petitioner's ability to obtain relief for the 2-year period, and it frets that Lucas would "be unable (absent our intervention now) to obtain further state-court adjudication with respect to the 1988–1990 period." *Ante*, at 1012. Whatever the explanation for the Court's intense interest in Lucas' plight when ordinarily we are more cautious in granting discretionary review, the concern would have been more prudently expressed by vacating the judgment below and remanding for further consideration in light of the 1990 amendments. At that point, petitioner could have brought a temporary takings claim in the state courts.

*ker,* 348 U. S. 26, 32 (1954). See also *Sweet* v. *Rechel,* 159 U. S. 380, 392 (1895); *Euclid,* 272 U. S., at 388 ("If the validity of the legislative classification for zoning purposes be fairly debatable, the legislative judgment must be allowed to control").

Accordingly, this Court always has required plaintiffs challenging the constitutionality of an ordinance to provide "some factual foundation of record" that contravenes the legislative findings. *O'Gorman & Young,* 282 U. S., at 258. In the absence of such proof, "the presumption of constitutionality must prevail." *Id.,* at 257. We only recently have reaffirmed that claimants have the burden of showing a state law constitutes a taking. See *Keystone Bituminous Coal,* 480 U. S., at 485. See also *Goldblatt,* 369 U. S., at 594 (citing "the usual presumption of constitutionality" that applies to statutes attacked as takings).

Rather than invoking these traditional rules, the Court decides the State has the burden to convince the courts that its legislative judgments are correct. Despite Lucas' complete failure to contest the legislature's findings of serious harm to life and property if a permanent structure is built, the Court decides that the legislative findings are not sufficient to justify the use prohibition. Instead, the Court "emphasize[s]" the State must do more than merely proffer its legislative judgments to avoid invalidating its law. *Ante,* at 1031. In this case, apparently, the State now has the burden of showing the regulation is not a taking. The Court offers no justification for its sudden hostility toward state legislators, and I doubt that it could.

## IV

The Court does not reject the South Carolina Supreme Court's decision simply on the basis of its disbelief and distrust of the legislature's findings. It also takes the opportunity to create a new scheme for regulations that eliminate all economic value. From now on, there is a categorical rule finding these regulations to be a taking unless the use they

prohibit is a background common-law nuisance or property principle. See *ante*, at 1028–1031.

## A

I first question the Court's rationale in creating a category that obviates a "case-specific inquiry into the public interest advanced," *ante*, at 1015, if all economic value has been lost. If one fact about the Court's takings jurisprudence can be stated without contradiction, it is that "the particular circumstances of each case" determine whether a specific restriction will be rendered invalid by the government's failure to pay compensation. *United States* v. *Central Eureka Mining Co.*, 357 U. S. 155, 168 (1958). This is so because although we have articulated certain factors to be considered, including the economic impact on the property owner, the ultimate conclusion "necessarily requires a weighing of private and public interests." *Agins*, 447 U. S., at 261. When the government regulation prevents the owner from any economically valuable use of his property, the private interest is unquestionably substantial, but we have never before held that no public interest can outweigh it. Instead the Court's prior decisions "uniformly reject the proposition that diminution in property value, standing alone, can establish a 'taking.'" *Penn Central Transp. Co.* v. *New York City*, 438 U. S. 104, 131 (1978).

This Court repeatedly has recognized the ability of government, in certain circumstances, to regulate property without compensation no matter how adverse the financial effect on the owner may be. More than a century ago, the Court explicitly upheld the right of States to prohibit uses of property injurious to public health, safety, or welfare without paying compensation: "A prohibition simply upon the use of property for purposes that are declared, by valid legislation, to be injurious to the health, morals, or safety of the community, cannot, in any just sense, be deemed a taking or an appropriation of property." *Mugler* v. *Kansas*, 123

U. S., at 668–669. On this basis, the Court upheld an ordinance effectively prohibiting operation of a previously lawful brewery, although the "establishments will become of no value as property." *Id.*, at 664; see also *id.*, at 668.

*Mugler* was only the beginning in a long line of cases.[8]  In *Powell* v. *Pennsylvania,* 127 U. S. 678 (1888), the Court upheld legislation prohibiting the manufacture of oleomargarine, despite the owner's allegation that "if prevented from continuing it, the value of his property employed therein would be entirely lost and he be deprived of the means of livelihood." *Id.*, at 682. In *Hadacheck* v. *Sebastian,* 239 U. S. 394 (1915), the Court upheld an ordinance prohibiting a brickyard, although the owner had made excavations on the land that prevented it from being utilized for any purpose but a brickyard. *Id.*, at 405. In *Miller* v. *Schoene,* 276 U. S. 272 (1928), the Court held that the Fifth Amendment did not require Virginia to pay compensation to the owner of cedar trees ordered destroyed to prevent a disease from spreading to nearby apple orchards. The "preferment of [the public interest] over the property interest of the individual, to the extent even of its destruction, is one of the distinguishing characteristics of every exercise of the police power which affects property." *Id.*, at 280. Again, in *Omnia Commercial Co.* v. *United States,* 261 U. S. 502 (1923), the Court stated that "destruction of, or injury to, property is frequently accomplished without a 'taking' in the constitutional sense." *Id.*, at 508.

More recently, in *Goldblatt,* the Court upheld a town regulation that barred continued operation of an existing sand and gravel operation in order to protect public safety. 369

---

[8] Prior to *Mugler,* the Court had held that owners whose real property is wholly destroyed to prevent the spread of a fire are not entitled to compensation. *Bowditch* v. *Boston,* 101 U. S. 16, 18–19 (1880). And the Court recognized in the *License Cases,* 5 How. 504, 589 (1847) (opinion of McLean, J.), that "[t]he acknowledged police power of a State extends often to the destruction of property."

U. S., at 596. "Although a comparison of values before and after is relevant," the Court stated, "it is by no means conclusive."[9] *Id.*, at 594. In 1978, the Court declared that "in instances in which a state tribunal reasonably concluded that 'the health, safety, morals, or general welfare' would be promoted by prohibiting particular contemplated uses of land, this Court has upheld land-use regulation that destroyed . . . recognized real property interests." *Penn Central Transp. Co.*, 438 U. S., at 125. In *First English Evangelical Lutheran Church of Glendale* v. *County of Los Angeles*, 482 U. S. 304 (1987), the owner alleged that a floodplain ordinance had deprived it of "all use" of the property. *Id.*, at 312. The Court remanded the case for consideration whether, even if the ordinance denied the owner all use, it could be justified as a safety measure.[10] *Id.*, at 313. And in *Keystone Bituminous Coal*, the Court summarized over 100 years of precedent: "[T]he Court has repeatedly upheld regulations that destroy or adversely affect real property interests."[11] 480 U. S., at 489, n. 18.

---

[9] That same year, an appeal came to the Court asking "[w]hether zoning ordinances which altogether destroy the worth of valuable land by prohibiting the only economic use of which it is capable effect a taking of real property without compensation." Juris. Statement, O. T. 1962, No. 307, p. 5. The Court dismissed the appeal for lack of a substantial federal question. *Consolidated Rock Products Co.* v. *Los Angeles*, 57 Cal. 2d 515, 370 P. 2d 342, appeal dism'd, 371 U. S. 36 (1962).

[10] On remand, the California court found no taking in part because the zoning regulation "involves this highest of public interests—the prevention of death and injury." *First Lutheran Church* v. *Los Angeles*, 210 Cal. App. 3d 1353, 1370, 258 Cal. Rptr. 893, 904 (1989), cert. denied, 493 U. S. 1056 (1990).

[11] The Court's suggestion that *Agins* v. *City of Tiburon*, 447 U. S. 255 (1980), a unanimous opinion, created a new *per se* rule, only now discovered, is unpersuasive. In *Agins*, the Court stated that "no precise rule determines when property has been taken" but instead that "the question necessarily requires a weighing of public and private interest." *Id.*, at 260–262. The other cases cited by the Court, *ante*, at 1015, repeat the *Agins* sentence, but in no way suggest that the public interest is irrelevant

The Court recognizes that "our prior opinions have suggested that 'harmful or noxious uses' of property may be proscribed by government regulation without the requirement of compensation," *ante*, at 1022, but seeks to reconcile them with its categorical rule by claiming that the Court never has upheld a regulation when the owner alleged the loss of all economic value. Even if the Court's factual premise were correct, its understanding of the Court's cases is distorted. In none of the cases did the Court suggest that the right of a State to prohibit certain activities without paying compensation turned on the availability of some residual valuable use.[12] Instead, the cases depended on whether the

---

if total value has been taken. The Court has indicated that proof that a regulation does *not* deny an owner economic use of his property is sufficient to defeat a facial takings challenge. See *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U. S. 264, 295–297 (1981). But the conclusion that a regulation is not on its face a taking because it allows the landowner some economic use of property is a far cry from the proposition that *denial* of such use is sufficient to establish a takings claim regardless of any other consideration. The Court never has accepted the latter proposition.

The Court relies today on dicta in *Agins, Hodel, Nollan* v. *California Coastal Comm'n*, 483 U. S. 825 (1987), and *Keystone Bituminous Coal Assn.* v. *DeBenedictis*, 480 U. S. 470 (1987), for its new categorical rule. *Ante*, at 1015–1016. I prefer to rely on the directly contrary holdings in cases such as *Mugler* v. *Kansas*, 123 U. S. 623 (1887), and *Hadacheck* v. *Sebastian*, 239 U. S. 394 (1915), not to mention contrary statements in the very cases on which the Court relies. See *Agins*, 447 U. S., at 260–262; *Keystone Bituminous Coal*, 480 U. S., at 489, n. 18, 491–492.

[12] *Miller* v. *Schoene*, 276 U. S. 272 (1928), is an example. In the course of demonstrating that apple trees are more valuable than red cedar trees, the Court noted that red cedar has "occasional use and value as lumber." *Id.*, at 279. But the Court did not discuss whether the timber owned by the petitioner in that case was commercially salable, and nothing in the opinion suggests that the State's right to require uncompensated felling of the trees depended on any such salvage value. To the contrary, it is clear from its unanimous opinion that the *Schoene* Court would have sustained a law requiring the burning of cedar trees if that had been necessary to protect apple trees in which there was a public interest: The Court

government interest was sufficient to prohibit the activity, given the significant private cost.[13]

These cases rest on the principle that the State has full power to prohibit an owner's use of property if it is harmful to the public. "[S]ince no individual has a right to use his property so as to create a nuisance or otherwise harm others, the State has not 'taken' anything when it asserts its power to enjoin the nuisance-like activity." *Keystone Bituminous Coal*, 480 U. S., at 491, n. 20. It would make no sense under this theory to suggest that an owner has a constitutionally protected right to harm others, if only he makes the proper showing of economic loss.[14] See *Pennsylvania Coal Co.* v. *Mahon*, 260 U. S. 393, 418 (1922) (Brandeis, J., dissenting) ("Restriction upon [harmful] use does not become inappropriate as a means, merely because it deprives the owner of the only use to which the property can then be profitably put").

---

spoke of preferment of the public interest over the property interest of the individual, "to the extent even of its destruction." *Id.*, at 280.

[13] The Court seeks to disavow the holdings and reasoning of *Mugler* and subsequent cases by explaining that they were the Court's early efforts to define the scope of the police power. There is language in the earliest takings cases suggesting that the police power was considered to be the power simply to prevent harms. Subsequently, the Court expanded its understanding of what were government's legitimate interests. But it does not follow that the holding of those early cases—that harmful and noxious uses of property can be forbidden whatever the harm to the property owner and without the payment of compensation—was repudiated. To the contrary, as the Court consciously expanded the scope of the police power beyond preventing harm, it clarified that there was a core of public interests that overrode any private interest. See *Keystone Bituminous Coal*, 480 U. S., at 491, n. 20.

[14] "Indeed, it would be extraordinary to construe the Constitution to require a government to compensate private landowners because it denied them 'the right' to use property which cannot be used without risking injury and death." *First Lutheran Church*, 210 Cal. App. 3d, at 1366, 258 Cal. Rptr., at 901–902.

## B

Ultimately even the Court cannot embrace the full implications of its *per se* rule: It eventually agrees that there cannot be a categorical rule for a taking based on economic value that wholly disregards the public need asserted. Instead, the Court decides that it will permit a State to regulate all economic value only if the State prohibits uses that would not be permitted under "background principles of nuisance and property law."[15]  *Ante,* at 1031.

Until today, the Court explicitly had rejected the contention that the government's power to act without paying compensation turns on whether the prohibited activity is a common-law nuisance.[16]  The brewery closed in *Mugler* itself was not a common-law nuisance, and the Court specifically stated that it was the role of the legislature to deter-

---

[15] Although it refers to state nuisance and property law, the Court apparently does not mean just any state nuisance and property law.  Public nuisance was first a common-law creation, see Newark, The Boundaries of Nuisance, 65 L. Q. Rev. 480, 482 (1949) (attributing development of nuisance to 1535), but by the 1800's in both the United States and England, legislatures had the power to define what is a public nuisance, and particular uses often have been selectively targeted.  See Prosser, Private Action for Public Nuisance, 52 Va. L. Rev. 997, 999–1000 (1966); J. Stephen, A General View of the Criminal Law of England 105–107 (2d ed. 1890). The Court's references to "common-law" background principles, however, indicate that legislative determinations do not constitute "state nuisance and property law" for the Court.

[16] Also, until today the fact that the regulation prohibited uses that were lawful at the time the owner purchased did not determine the constitutional question.  The brewery, the brickyard, the cedar trees, and the gravel pit were all perfectly legitimate uses prior to the passage of the regulation.  See *Mugler* v. *Kansas,* 123 U. S., at 654; *Hadacheck* v. *Sebastian,* 239 U. S. 394 (1915); *Miller,* 276 U. S., at 272; *Goldblatt* v. *Hempstead,* 369 U. S. 590 (1962).  This Court explicitly acknowledged in *Hadacheck* that "[a] vested interest cannot be asserted against [the police power] because of conditions once obtaining.  To so hold would preclude development and fix a city forever in its primitive conditions."  239 U. S., at 410 (citation omitted).

mine what measures would be appropriate for the protection of public health and safety. See 123 U. S., at 661. In upholding the state action in *Miller*, the Court found it unnecessary to "weigh with nicety the question whether the infected cedars constitute a nuisance according to common law; or whether they may be so declared by statute." 276 U. S., at 280. See also *Goldblatt*, 369 U. S., at 593; *Hadacheck*, 239 U. S., at 411. Instead the Court has relied in the past, as the South Carolina court has done here, on legislative judgments of what constitutes a harm.[17]

The Court rejects the notion that the State always can prohibit uses it deems a harm to the public without granting compensation because "the distinction between 'harm-preventing' and 'benefit-conferring' regulation is often in the eye of the beholder." *Ante*, at 1024. Since the characterization will depend "primarily upon one's evaluation of the worth of competing uses of real estate," *ante*, at 1025, the Court decides a legislative judgment of this kind no longer can provide the desired "objective, value-free basis" for upholding a regulation, *ante*, at 1026. The Court, however, fails to explain how its proposed common-law alternative escapes the same trap.

---

[17] The Court argues that finding no taking when the legislature prohibits a harmful use, such as the Court did in *Mugler* and the South Carolina Supreme Court did in the instant case, would nullify *Pennsylvania Coal*. See *ante*, at 1022–1023. Justice Holmes, the author of *Pennsylvania Coal*, joined *Miller* v. *Schoene*, 276 U. S. 272 (1928), six years later. In *Miller*, the Court adopted the exact approach of the South Carolina court: It found the cedar trees harmful, and their destruction not a taking, whether or not they were a nuisance. Justice Holmes apparently believed that such an approach did not repudiate his earlier opinion. Moreover, this Court already has been over this ground five years ago, and at that point rejected the assertion that *Pennsylvania Coal* was inconsistent with *Mugler, Hadacheck, Miller*, or the others in the string of "noxious use" cases, recognizing instead that the nature of the State's action is critical in takings analysis. *Keystone Bituminous Coal*, 480 U. S., at 490.

The threshold inquiry for imposition of the Court's new rule, "deprivation of all economically valuable use," itself cannot be determined objectively. As the Court admits, whether the owner has been deprived of all economic value of his property will depend on how "property" is defined. The "composition of the denominator in our 'deprivation' fraction," *ante*, at 1017, n. 7, is the dispositive inquiry. Yet there is no "objective" way to define what that denominator should be. "We have long understood that any land-use regulation can be characterized as the 'total' deprivation of an aptly defined entitlement. . . . Alternatively, the same regulation can always be characterized as a mere 'partial' withdrawal from full, unencumbered ownership of the landholding affected by the regulation . . . ."[18] Michelman, Takings, 1987, 88 Colum. L. Rev. 1600, 1614 (1988).

The Court's decision in *Keystone Bituminous Coal* illustrates this principle perfectly. In *Keystone*, the Court determined that the "support estate" was "merely a part of the entire bundle of rights possessed by the owner." 480 U. S., at 501. Thus, the Court concluded that the support estate's destruction merely eliminated one segment of the total property. *Ibid.* The dissent, however, characterized the support estate as a distinct property interest that was wholly destroyed. *Id.*, at 519. The Court could agree on no "value-free basis" to resolve this dispute.

Even more perplexing, however, is the Court's reliance on common-law principles of nuisance in its quest for a value-free takings jurisprudence. In determining what is a nuisance at common law, state courts make exactly the decision that the Court finds so troubling when made by the South Carolina General Assembly today: They determine whether the use is harmful. Common-law public and private nui-

---

[18] See also Michelman, Property, Utility, and Fairness, Comments on the Ethical Foundations of "Just Compensation" Law, 80 Harv. L. Rev. 1165, 1192–1193 (1967); Sax, Takings and the Police Power, 74 Yale L. J. 36, 60 (1964).

sance law is simply a determination whether a particular use causes harm. See Prosser, Private Action for Public Nuisance, 52 Va. L. Rev. 997 (1966) ("*Nuisance* is a French word which means nothing more than harm"). There is nothing magical in the reasoning of judges long dead. They determined a harm in the same way as state judges and legislatures do today. If judges in the 18th and 19th centuries can distinguish a harm from a benefit, why not judges in the 20th century, and if judges can, why not legislators? There simply is no reason to believe that new interpretations of the hoary common-law nuisance doctrine will be particularly "objective" or "value free." [19] Once one abandons the level of generality of *sic utere tuo ut alienum non laedas, ante,* at 1031, one searches in vain, I think, for anything resembling a principle in the common law of nuisance.

## C

Finally, the Court justifies its new rule that the legislature may not deprive a property owner of the only economically valuable use of his land, even if the legislature finds it to be a harmful use, because such action is not part of the " 'long recognized' " "understandings of our citizens." *Ante,* at 1027. These "understandings" permit such regulation only if the use is a nuisance under the common law. Any other course is "inconsistent with the historical compact recorded in the Takings Clause." *Ante,* at 1028. It is not clear from the Court's

---

[19] "There is perhaps no more impenetrable jungle in the entire law than that which surrounds the word 'nuisance.' It has meant all things to all people, and has been applied indiscriminately to everything from an alarming advertisement to a cockroach baked in a pie." W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on The Law of Torts 616 (5th ed. 1984) (footnotes omitted). It is an area of law that "straddles the legal universe, virtually defies synthesis, and generates case law to suit every taste." W. Rodgers, Environmental Law §2.4, p. 48 (1986) (footnotes omitted). The Court itself has noted that "nuisance concepts" are "often vague and indeterminate." *Milwaukee* v. *Illinois,* 451 U. S. 304, 317 (1981).

opinion where our "historical compact" or "citizens' under-standing" comes from, but it does not appear to be history.

The principle that the State should compensate individuals for property taken for public use was not widely established in America at the time of the Revolution.

> "The colonists ... inherited ... a concept of property which permitted extensive regulation of the use of that property for the public benefit—regulation that could even go so far as to deny all productive use of the property to the owner if, as Coke himself stated, the regulation 'extends to the public benefit . . . for this is for the public, and every one hath benefit by it.' "  F. Bosselman, D. Callies, & J. Banta, The Taking Issue 80–81 (1973), quoting *The Case of the King's Prerogative in Saltpetre*, 12 Co. Rep. 12–13 (1606) (hereinafter Bosselman).

See also Treanor, The Origins and Original Significance of the Just Compensation Clause of the Fifth Amendment, 94 Yale L. J. 694, 697, n. 9 (1985).[20]

Even into the 19th century, state governments often felt free to take property for roads and other public projects without paying compensation to the owners.[21]  See M. Horwitz, The Transformation of American Law, 1780–1860, pp. 63–64 (1977) (hereinafter Horwitz); Treanor, 94 Yale L. J., at 695.  As one court declared in 1802, citizens "were bound

---

[20] See generally Sax, 74 Yale L. J., at 56–59.  "The evidence certainly seems to indicate that the mere fact that government activity destroyed existing economic advantages and power did not disturb [the English theorists who formulated the compensation notion] at all." *Id.*, at 56.  Professor Sax contends that even Blackstone, "remembered champion of the language of private property," did not believe that the Compensation Clause was meant to preserve economic value. *Id.*, at 58–59.

[21] In 1796, the attorney general of South Carolina responded to property holders' demand for compensation when the State took their land to build a road by arguing that "there is not one instance on record, and certainly none within the memory of the oldest man now living, of any demand being made for compensation for the soil or freehold of the lands." *Lindsay* v. *Commissioners*, 2 S. C. L. 38, 49 (1796).

to contribute as much of [land], as by the laws of the country, were deemed necessary for the public convenience." *M'Clenachan* v. *Curwin*, 3 Yeates 362, 373 (Pa. 1802). There was an obvious movement toward establishing the just compensation principle during the 19th century, but "there continued to be a strong current in American legal thought that regarded compensation simply as a 'bounty given . . . by the State' out of 'kindness' and not out of justice." Horwitz 65, quoting *Commonwealth* v. *Fisher*, 1 Pen. & W. 462, 465 (Pa. 1830). See also *State* v. *Dawson*, 3 Hill 100, 103 (S. C. 1836).[22]

Although, prior to the adoption of the Bill of Rights, America was replete with land-use regulations describing which activities were considered noxious and forbidden, see Bender, The Takings Clause: Principles or Politics?, 34 Buffalo L. Rev. 735, 751 (1985); L. Friedman, A History of American Law 66–68 (1973), the Fifth Amendment's Takings Clause originally did not extend to regulations of property, whatever the effect.[23] See *ante*, at 1014. Most state courts agreed with this narrow interpretation of a taking. "Until the end of the nineteenth century . . . jurists held that

[22] Only the Constitutions of Vermont and Massachusetts required that compensation be paid when private property was taken for public use; and although eminent domain was mentioned in the Pennsylvania Constitution, its sole requirement was that property not be taken without the consent of the legislature. See Grant, The "Higher Law" Background of the Law of Eminent Domain, in 2 Selected Essays on Constitutional Law 912, 915–916 (1938). By 1868, five of the original States still had no just compensation clauses in their Constitutions. *Ibid.*

[23] James Madison, author of the Takings Clause, apparently intended it to apply only to direct, physical takings of property by the Federal Government. See Treanor, The Origins and Original Significance of the Just Compensation Clause of the Fifth Amendment, 94 Yale L. J. 694, 711 (1985). Professor Sax argues that although "contemporaneous commentary upon the meaning of the compensation clause is in very short supply," 74 Yale L. J., at 58, the "few authorities that are available" indicate that the Clause was "designed to prevent arbitrary government action," not to protect economic value. *Id.*, at 58–60.

the constitution protected possession only, and not value." Siegel, Understanding the Nineteenth Century Contract Clause: The Role of the Property-Privilege Distinction and "Takings" Clause Jurisprudence, 60 S. Cal. L. Rev. 1, 76 (1986); Bosselman 106. Even indirect and consequential injuries to property resulting from regulations were excluded from the definition of a taking. See *ibid.; Callender* v. *Marsh*, 1 Pick. 418, 430 (Mass. 1823).

Even when courts began to consider that regulation in some situations could constitute a taking, they continued to uphold bans on particular uses without paying compensation, notwithstanding the economic impact, under the rationale that no one can obtain a vested right to injure or endanger the public.[24] In the *Coates* cases, for example, the Supreme Court of New York found no taking in New York's ban on the interment of the dead within the city, although "no other use can be made of these lands." *Coates* v. *City of New York*, 7 Cow. 585, 592 (N. Y. 1827). See also *Brick Presbyterian Church* v. *City of New York*, 5 Cow. 538 (N. Y. 1826); *Commonwealth* v. *Alger*, 7 Cush. 53, 59, 104 (Mass. 1851); *St. Louis Gunning Advertisement Co.* v. *St. Louis*, 235 Mo. 99, 146, 137 S. W. 929, 942 (1911), appeal dism'd, 231 U. S. 761 (1913). More recent cases reach the same result. See *Consolidated Rock Products Co.* v. *Los Angeles*, 57 Cal. 2d 515, 370 P. 2d 342, appeal dism'd, 371 U. S. 36 (1962); *Nassr* v.

---

[24] For this reason, the retroactive application of the regulation to formerly lawful uses was not a controlling distinction in the past. "Nor can it make any difference that the right is purchased previous to the passage of the by-law," for "[e]very right, from an absolute ownership in property, down to a mere easement, is purchased and holden subject to the restriction, that it shall be so exercised as not to injure others. Though, at the time, it be remote and inoffensive, the purchaser is bound to know, at his peril, that it may become otherwise." *Coates* v. *City of New York*, 7 Cow. 585, 605 (N. Y. 1827). See also *Brick Presbyterian Church* v. *City of New York*, 5 Cow. 538, 542 (N. Y. 1826); *Commonwealth* v. *Tewksbury*, 11 Metc. 55 (Mass. 1846); *State* v. *Paul*, 5 R. I. 185 (1858).

*Commonwealth*, 394 Mass. 767, 477 N. E. 2d 987 (1985); *Eno* v. *Burlington*, 125 Vt. 8, 209 A. 2d 499 (1965); *Turner* v. *County of Del Norte*, 24 Cal. App. 3d 311, 101 Cal. Rptr. 93 (1972).

In addition, state courts historically have been less likely to find that a government action constitutes a taking when the affected land is undeveloped. According to the South Carolina court, the power of the legislature to take unimproved land without providing compensation was sanctioned by "ancient rights and principles." *Lindsay* v. *Commissioners*, 2 S. C. L. 38, 57 (1796). "Except for Massachusetts, no colony appears to have paid compensation when it built a state-owned road across unimproved land. Legislatures provided compensation only for enclosed or improved land." Treanor, 94 Yale L. J., at 695 (footnotes omitted). This rule was followed by some States into the 1800's. See Horwitz 63–65.

With similar result, the common agrarian conception of property limited owners to "natural" uses of their land prior to and during much of the 18th century. See *id.*, at 32. Thus, for example, the owner could build nothing on his land that would alter the natural flow of water. See *id.*, at 44; see also, *e. g.*, *Merritt* v. *Parker*, 1 Coxe 460, 463 (N. J. 1795). Some more recent state courts still follow this reasoning. See, *e. g.*, *Just* v. *Marinette County*, 56 Wis. 2d 7, 201 N. W. 2d 761, 768 (1972).

Nor does history indicate any common-law limit on the State's power to regulate harmful uses even to the point of destroying all economic value. Nothing in the discussions in Congress concerning the Takings Clause indicates that the Clause was limited by the common-law nuisance doctrine. Common-law courts themselves rejected such an understanding. They regularly recognized that it is "for the legislature to interpose, and by positive enactment to prohibit a use of property which would be injurious to the public."

*Tewksbury,* 11 Metc., at 57.[25]    Chief Justice Shaw explained in upholding a regulation prohibiting construction of wharves, the existence of a taking did not depend on "whether a certain erection in tide water is a nuisance at common law or not." *Alger,* 7 Cush., at 104; see also *State* v. *Paul,* 5 R. I. 185, 193 (1858); *Commonwealth* v. *Parks,* 155 Mass. 531, 532, 30 N. E. 174 (1892) (Holmes, J.) ("[T]he legislature may change the common law as to nuisances, and may move the line either way, so as to make things nuisances which were not so, or to make things lawful which were nuisances").

In short, I find no clear and accepted "historical compact" or "understanding of our citizens" justifying the Court's new takings doctrine.    Instead, the Court seems to treat history as a grab bag of principles, to be adopted where they support the Court's theory, and ignored where they do not.    If the Court decided that the early common law provides the background principles for interpreting the Takings Clause, then regulation, as opposed to physical confiscation, would not be compensable.    If the Court decided that the law of a later period provides the background principles, then regulation might be compensable, but the Court would have to confront the fact that legislatures regularly determined which uses were prohibited, independent of the common law, and independent of whether the uses were lawful when the owner purchased.    What makes the Court's analysis unworkable is its attempt to package the law of two incompatible eras and peddle it as historical fact.[26]

---

[25] More recent state-court decisions agree.    See, *e. g., Lane* v. *Mt. Vernon,* 38 N. Y. 2d 344, 348–349, 342 N. E. 2d 571, 573 (1976); *Commonwealth* v. *Baker,* 160 Pa. Super. 640, 641–642, 53 A. 2d 829, 830 (1947).

[26] The Court asserts that all early American experience, prior to and after passage of the Bill of Rights, and any case law prior to 1897 are "entirely irrelevant" in determining what is "the historical compact recorded in the Takings Clause." *Ante,* at 1028, and n. 15.    Nor apparently are we to find this compact in the early federal takings cases, which clearly permitted prohibition of harmful uses despite the alleged loss of all value,

## V

The Court makes sweeping and, in my view, misguided and unsupported changes in our takings doctrine. While it limits these changes to the most narrow subset of government regulation—those that eliminate all economic value from land—these changes go far beyond what is necessary to secure petitioner Lucas' private benefit. One hopes they do not go beyond the narrow confines the Court assigns them to today.

I dissent.

JUSTICE STEVENS, dissenting.

Today the Court restricts one judge-made rule and expands another. In my opinion it errs on both counts. Proper application of the doctrine of judicial restraint would avoid the premature adjudication of an important constitutional question. Proper respect for our precedents would avoid an illogical expansion of the concept of "regulatory takings."

## I

As the Court notes, *ante*, at 1010–1011, South Carolina's Beachfront Management Act has been amended to permit some construction of residences seaward of the line that frustrated petitioner's proposed use of his property. Until he exhausts his right to apply for a special permit under that amendment, petitioner is not entitled to an adjudication by this Court of the merits of his permanent takings claim. *MacDonald, Sommer & Frates* v. *Yolo County*, 477 U. S. 340, 351 (1986).

It is also not clear that he has a viable "temporary takings" claim. If we assume that petitioner is now able to build on the lot, the only injury that he may have suffered is

---

whether or not the prohibition was a common-law nuisance, and whether or not the prohibition occurred subsequent to the purchase. See *supra*, at 1047–1048, 1052–1053, and n. 16. I cannot imagine where the Court finds its "historical compact," if not in history.

the delay caused by the temporary existence of the absolute statutory ban on construction. We cannot be sure, however, that that delay caused petitioner any harm because the record does not tell us whether his building plans were even temporarily frustrated by the enactment of the statute.[1] Thus, on the present record it is entirely possible that petitioner has suffered no injury in fact even if the state statute was unconstitutional when he filed this lawsuit.

It is true, as the Court notes, that the argument against deciding the constitutional issue in this case rests on prudential considerations rather than a want of jurisdiction. I think it equally clear, however, that a Court less eager to decide the merits would follow the wise counsel of Justice Brandeis in his deservedly famous concurring opinion in *Ashwander* v. *TVA*, 297 U. S. 288, 341 (1936). As he explained, the Court has developed "for its own governance in the cases confessedly within its jurisdiction, a series of rules under which it has avoided passing upon a large part of all the constitutional questions pressed upon it for decision." *Id.*, at 346. The second of those rules applies directly to this case.

> "2. The Court will not 'anticipate a question of constitutional law in advance of the necessity of deciding it.' *Liverpool, N. Y. & P. S. S. Co.* v. *Emigration Commissioners*, 113 U. S. 33, 39; [citing five additional cases]. 'It is not the habit of the Court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case.' *Burton* v. *United States*, 196 U. S. 283, 295." *Id.*, at 346–347.

Cavalierly dismissing the doctrine of judicial restraint, the Court today tersely announces that "we do not think it prudent to apply that prudential requirement here." *Ante*, at

---

[1] In this regard, it is noteworthy that petitioner acquired the lot about 18 months before the statute was passed; there is no evidence that he ever sought a building permit from the local authorities.

1013. I respectfully disagree and would save consideration of the merits for another day. Since, however, the Court has reached the merits, I shall do so as well.

## II

In its analysis of the merits, the Court starts from the premise that this Court has adopted a "categorical rule that total regulatory takings must be compensated," *ante,* at 1026, and then sets itself to the task of identifying the exceptional cases in which a State may be relieved of this categorical obligation, *ante,* at 1027–1029. The test the Court announces is that the regulation must "do no more than duplicate the result that could have been achieved" under a State's nuisance law. *Ante,* at 1029. Under this test the categorical rule will apply unless the regulation merely makes explicit what was otherwise an implicit limitation on the owner's property rights.

In my opinion, the Court is doubly in error. The categorical rule the Court establishes is an unsound and unwise addition to the law and the Court's formulation of the exception to that rule is too rigid and too narrow.

### The Categorical Rule

As the Court recognizes, *ante,* at 1015, *Pennsylvania Coal Co.* v. *Mahon,* 260 U. S. 393 (1922), provides no support for its—or, indeed, any—categorical rule. To the contrary, Justice Holmes recognized that such absolute rules ill fit the inquiry into "regulatory takings." Thus, in the paragraph that contains his famous observation that a regulation may go "too far" and thereby constitute a taking, the Justice wrote: "As we already have said, this is a question of degree—and therefore cannot be disposed of by general propositions." *Id.,* at 416. What he had "already . . . said" made perfectly clear that Justice Holmes regarded economic injury to be merely one factor to be weighed: "One fact for consideration in determining such limits is the extent of the diminu-

tion [of value.] So the question depends upon the particular facts." *Id.*, at 413.

Nor does the Court's new categorical rule find support in decisions following *Mahon*. Although in dicta we have sometimes recited that a law "effects a taking if [it] . . . denies an owner economically viable use of his land," *Agins* v. *City of Tiburon*, 447 U. S. 255, 260 (1980), our *rulings* have rejected such an absolute position. We have frequently—and recently—held that, in some circumstances, a law that renders property valueless may nonetheless not constitute a taking. See, *e. g., First English Evangelical Lutheran Church of Glendale* v. *County of Los Angeles*, 482 U. S. 304, 313 (1987); *Goldblatt* v. *Hempstead*, 369 U. S. 590, 596 (1962); *United States* v. *Caltex*, 344 U. S. 149, 155 (1952); *Miller* v. *Schoene*, 276 U. S. 272 (1928); *Hadacheck* v. *Sebastian*, 239 U. S. 394, 405 (1915); *Mugler* v. *Kansas*, 123 U. S. 623, 657 (1887); cf. *Ruckelshaus* v. *Monsanto Co.*, 467 U. S. 986, 1011 (1984); *Connolly* v. *Pension Benefit Guaranty Corporation*, 475 U. S. 211, 225 (1986). In short, as we stated in *Keystone Bituminous Coal Assn.* v. *DeBenedictis*, 480 U. S. 470, 490 (1987), "'Although a comparison of values before and after' a regulatory action 'is relevant, . . . it is by no means conclusive.'"

In addition to lacking support in past decisions, the Court's new rule is wholly arbitrary. A landowner whose property is diminished in value 95% recovers nothing, while an owner whose property is diminished 100% recovers the land's full value. The case at hand illustrates this arbitrariness well. The Beachfront Management Act not only prohibited the building of new dwellings in certain areas, it also prohibited the rebuilding of houses that were "destroyed beyond repair by natural causes or by fire." 1988 S. C. Acts 634, § 3; see also *Esposito* v. *South Carolina Coastal Council*, 939 F. 2d 165, 167 (CA4 1991).[2] Thus, if the homes adjacent to Lucas'

---

[2] This aspect of the Act was amended in 1990. See S. C. Code Ann. § 48–39–290(B) (Supp. 1990).

lot were destroyed by a hurricane one day after the Act took effect, the owners would not be able to rebuild, nor would they be assured recovery. Under the Court's categorical approach, Lucas (who has lost the opportunity to build) recovers, while his neighbors (who have lost *both* the opportunity to build *and* their homes) do not recover. The arbitrariness of such a rule is palpable.

Moreover, because of the elastic nature of property rights, the Court's new rule will also prove unsound in practice. In response to the rule, courts may define "property" broadly and only rarely find regulations to effect total takings. This is the approach the Court itself adopts in its revisionist reading of venerable precedents. We are told that—notwithstanding the Court's findings to the contrary in each case—the brewery in *Mugler*, the brickyard in *Hadacheck*, and the gravel pit in *Goldblatt* all could be put to "other uses" and that, therefore, those cases did not involve total regulatory takings.[3] *Ante*, at 1026, n. 13.

On the other hand, developers and investors may market specialized estates to take advantage of the Court's new rule. The smaller the estate, the more likely that a regulatory change will effect a total taking. Thus, an investor may, for example, purchase the right to build a multifamily home on a specific lot, with the result that a zoning regulation that

---

[3] Of course, the same could easily be said in this case: Lucas may put his land to "other uses"—fishing or camping, for example—or may sell his land to his neighbors as a buffer. In either event, his land is far from "valueless."

This highlights a fundamental weakness in the Court's analysis: its failure to explain why only the impairment of "*economically* beneficial or productive use," *ante*, at 1015 (emphasis added), of property is relevant in takings analysis. I should think that a regulation arbitrarily prohibiting an owner from continuing to use her property for bird watching or sunbathing might constitute a taking under some circumstances; and, conversely, that such uses are of value to the owner. Yet the Court offers no basis for its assumption that the only uses of property cognizable under the Constitution are *developmental* uses.

allows only single-family homes would render the investor's property interest "valueless."[4] In short, the categorical rule will likely have one of two effects: Either courts will alter the definition of the "denominator" in the takings "fraction," rendering the Court's categorical rule meaningless, or investors will manipulate the relevant property interests, giving the Court's rule sweeping effect. To my mind, neither of these results is desirable or appropriate, and both are distortions of our takings jurisprudence.

Finally, the Court's justification for its new categorical rule is remarkably thin. The Court mentions in passing three arguments in support of its rule; none is convincing. First, the Court suggests that "total deprivation of feasible use is, from the landowner's point of view, the equivalent of a physical appropriation." *Ante*, at 1017. This argument proves too much. From the "landowner's point of view," a regulation that diminishes a lot's value by 50% is as well "the equivalent" of the condemnation of half of the lot. Yet, it is well established that a 50% diminution in value does not by itself constitute a taking. See *Euclid* v. *Ambler Realty Co.*, 272 U. S. 365, 384 (1926) (75% diminution in value). Thus, the landowner's perception of the regulation cannot justify the Court's new rule.

Second, the Court emphasizes that because total takings are "relatively rare" its new rule will not adversely affect the government's ability to "go on." *Ante*, at 1018. This argument proves too little. Certainly it is true that defining a small class of regulations that are *per se* takings will not

---

[4] This unfortunate possibility is created by the Court's subtle revision of the "total regulatory takings" dicta. In past decisions, we have stated that a regulation effects a taking if it "denies an owner economically viable use of his *land*," *Agins* v. *City of Tiburon*, 447 U. S. 255, 260 (1980) (emphasis added), indicating that this "total takings" test did not apply to other estates. Today, however, the Court suggests that a regulation may effect a total taking of *any* real property interest. See *ante*, at 1016–1017, n. 7.

greatly hinder important governmental functions—but this is true of *any* small class of regulations. The Court's suggestion only begs the question of why regulations of *this* particular class should always be found to effect takings.

Finally, the Court suggests that "regulations that leave the owner . . . without economically beneficial . . . use . . . carry with them a heightened risk that private property is being pressed into some form of public service." *Ibid.* As discussed more fully below, see Part III, *infra*, I agree that the risks of such singling out are of central concern in takings law. However, such risks do not justify a *per se* rule for total regulatory takings. There is no necessary correlation between "singling out" and total takings: A regulation may single out a property owner without depriving him of all of his property, see, *e. g., Nollan* v. *California Coastal Comm'n,* 483 U. S. 825, 837 (1987); *J. E. D. Associates, Inc.* v. *Atkinson,* 121 N. H. 581, 432 A. 2d 12 (1981); and it may deprive him of all of his property without singling him out, see, *e. g., Mugler* v. *Kansas,* 123 U. S. 623 (1887); *Hadacheck* v. *Sebastian,* 239 U. S. 394 (1915). What matters in such cases is not the degree of diminution of value, but rather the specificity of the expropriating act. For this reason, the Court's third justification for its new rule also fails.

In short, the Court's new rule is unsupported by prior decisions, arbitrary and unsound in practice, and theoretically unjustified. In my opinion, a categorical rule as important as the one established by the Court today should be supported by more history or more reason than has yet been provided.

### The Nuisance Exception

Like many bright-line rules, the categorical rule established in this case is only "categorical" for a page or two in the U. S. Reports. No sooner does the Court state that "total regulatory takings must be compensated," *ante,* at 1026, than it quickly establishes an exception to that rule.

The exception provides that a regulation that renders property valueless is not a taking if it prohibits uses of property that were not "previously permissible under relevant property and nuisance principles." *Ante*, at 1029–1030. The Court thus rejects the basic holding in *Mugler* v. *Kansas*, 123 U. S. 623 (1887). There we held that a statewide statute that prohibited the owner of a brewery from making alcoholic beverages did not effect a taking, even though the use of the property had been perfectly lawful and caused no public harm before the statute was enacted. We squarely rejected the rule the Court adopts today:

> "It is true, that, when the defendants . . . erected their breweries, the laws of the State did not forbid the manufacture of intoxicating liquors. But the State did not thereby give any assurance, or come under an obligation, that its legislation upon that subject would remain unchanged. [T]he supervision of the public health and the public morals is a governmental power, 'continuing in its nature,' and 'to be dealt with as the special exigencies of the moment may require;' . . . 'for this purpose, the largest legislative discretion is allowed, and the discretion cannot be parted with any more than the power itself.'" *Id.*, at 669.

Under our reasoning in *Mugler*, a State's decision to prohibit or to regulate certain uses of property is not a compensable taking just because the particular uses were previously lawful. Under the Court's opinion today, however, if a State should decide to prohibit the manufacture of asbestos, cigarettes, or concealable firearms, for example, it must be prepared to pay for the adverse economic consequences of its decision. One must wonder if government will be able to "go on" effectively if it must risk compensation "for every such change in the general law." *Mahon*, 260 U. S., at 413.

The Court's holding today effectively freezes the State's common law, denying the legislature much of its traditional

power to revise the law governing the rights and uses of property. Until today, I had thought that we had long abandoned this approach to constitutional law. More than a century ago we recognized that "the great office of statutes is to remedy defects in the common law as they are developed, and to adapt it to the changes of time and circumstances." *Munn* v. *Illinois*, 94 U. S. 113, 134 (1877). As Justice Marshall observed about a position similar to that adopted by the Court today:

> "If accepted, that claim would represent a return to the era of *Lochner* v. *New York*, 198 U. S. 45 (1905), when common-law rights were also found immune from revision by State or Federal Government. Such an approach would freeze the common law as it has been constructed by the courts, perhaps at its 19th-century state of development. It would allow no room for change in response to changes in circumstance. The Due Process Clause does not require such a result." *PruneYard Shopping Center* v. *Robins*, 447 U. S. 74, 93 (1980) (concurring opinion).

Arresting the development of the common law is not only a departure from our prior decisions; it is also profoundly unwise. The human condition is one of constant learning and evolution—both moral and practical. Legislatures implement that new learning; in doing so they must often revise the definition of property and the rights of property owners. Thus, when the Nation came to understand that slavery was morally wrong and mandated the emancipation of all slaves, it, in effect, redefined "property." On a lesser scale, our ongoing self-education produces similar changes in the rights of property owners: New appreciation of the significance of endangered species, see, *e. g.*, *Andrus* v. *Allard*, 444 U. S. 51 (1979); the importance of wetlands, see, *e. g.*, 16 U. S. C. § 3801 *et seq.*; and the vulnerability of coastal

lands, see, *e. g.*, 16 U. S. C. § 1451 *et seq.*, shapes our evolving understandings of property rights.

Of course, some legislative redefinitions of property will effect a taking and must be compensated—but it certainly cannot be the case that every movement away from common law does so. There is no reason, and less sense, in such an absolute rule. We live in a world in which changes in the economy and the environment occur with increasing frequency and importance. If it was wise a century ago to allow government "'the largest legislative discretion'" to deal with "'the special exigencies of the moment,'" *Mugler*, 123 U. S., at 669, it is imperative to do so today. The rule that should govern a decision in a case of this kind should focus on the future, not the past.[5]

The Court's categorical approach rule will, I fear, greatly hamper the efforts of local officials and planners who must deal with increasingly complex problems in land-use and environmental regulation. As this case—in which the claims of an *individual* property owner exceed $1 million—well demonstrates, these officials face both substantial uncertainty because of the ad hoc nature of takings law and unacceptable penalties if they guess incorrectly about that law.[6]

_____

[5] Even measured in terms of efficiency, the Court's rule is unsound. The Court today effectively establishes a form of insurance against certain changes in land-use regulations. Like other forms of insurance, the Court's rule creates a "moral hazard" and inefficiencies: In the face of uncertainty about changes in the law, developers will overinvest, safe in the knowledge that if the law changes adversely, they will be entitled to compensation. See generally Farber, Economic Analysis and Just Compensation, 12 Int'l Rev. of Law & Econ. 125 (1992).

[6] As the Court correctly notes, in regulatory takings, unlike physical takings, courts have a choice of remedies. See *ante*, at 1030, n. 17. They may "invalidat[e the] excessive regulation" or they may "allo[w] the regulation to stand and orde[r] the government to afford compensation for the permanent taking." *First English Evangelical Lutheran Church of Glendale* v. *County of Los Angeles*, 482 U. S. 304, 335 (1987) (STEVENS, J., dissenting); see also *id.*, at 319–321. In either event, however, the costs to the government are likely to be substantial and are therefore likely to impede the development of sound land-use policy.

Viewed more broadly, the Court's new rule and exception conflict with the very character of our takings jurisprudence. We have frequently and consistently recognized that the definition of a taking cannot be reduced to a "set formula" and that determining whether a regulation is a taking is "essentially [an] ad hoc, factual inquir[y]." *Penn Central Transportation Co.* v. *New York City,* 438 U. S. 104, 124 (1978) (quoting *Goldblatt* v. *Hempstead,* 369 U. S., at 594). This is unavoidable, for the determination whether a law effects a taking is ultimately a matter of "fairness and justice," *Armstrong* v. *United States,* 364 U. S. 40, 49 (1960), and "necessarily requires a weighing of private and public interests," *Agins,* 447 U. S., at 261. The rigid rules fixed by the Court today clash with this enterprise: "fairness and justice" are often disserved by categorical rules.

### III

It is well established that a takings case "entails inquiry into [several factors:] the character of the governmental action, its economic impact, and its interference with reasonable investment-backed expectations." *PruneYard,* 447 U. S., at 83. The Court's analysis today focuses on the last two of these three factors: The categorical rule addresses a regulation's "economic impact," while the nuisance exception recognizes that ownership brings with it only certain "expectations." Neglected by the Court today is the first and, in some ways, the most important factor in takings analysis: the character of the regulatory action.

The Just Compensation Clause "was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong,* 364 U. S., at 49. Accordingly, one of the central concerns of our takings jurisprudence is "prevent[ing] the public from loading upon one individual more than his just share of the burdens of government." *Monongahela Navigation Co.* v. *United*

*States,* 148 U. S. 312, 325 (1893). We have, therefore, in our takings law frequently looked to the *generality* of a regulation of property.[7]

For example, in the case of so-called "developmental exactions," we have paid special attention to the risk that particular landowners might "b[e] singled out to bear the burden" of a broader problem not of his own making. *Nollan,* 483 U. S., at 835, n. 4; see also *Pennell* v. *San Jose,* 485 U. S. 1, 23 (1988). Similarly, in distinguishing between the Kohler Act (at issue in *Mahon*) and the Subsidence Act (at issue in *Keystone*), we found significant that the regulatory function of the latter was substantially broader. Unlike the Kohler

---

[7] This principle of generality is well rooted in our broader understandings of the Constitution as designed in part to control the "mischiefs of faction." See The Federalist No. 10, p. 43 (G. Wills ed. 1982) (J. Madison).

An analogous concern arises in First Amendment law. There we have recognized that an individual's rights are not violated when his religious practices are prohibited under a neutral law of general applicability. For example, in *Employment Div., Dept. of Human Resources of Ore.* v. *Smith,* 494 U. S. 872, 879–880 (1990), we observed:

"[Our] decisions have consistently held that the right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).' *United States* v. *Lee,* 455 U. S. 252, 263, n. 3 (1982) (STEVENS, J., concurring in judgment). . . . In *Prince* v. *Massachusetts,* 321 U. S. 158 (1944), we held that a mother could be prosecuted under the child labor laws for using her children to dispense literature in the streets, her religious motivation notwithstanding. We found no constitutional infirmity in 'excluding [these children] from doing there what no other children may do.' *Id.,* at 171. In *Braunfeld* v. *Brown,* 366 U. S. 599 (1961) (plurality opinion), we upheld Sunday-closing laws against the claim that they burdened the religious practices of persons whose religions compelled them to refrain from work on other days. In *Gillette* v. *United States,* 401 U. S. 437, 461 (1971), we sustained the military Selective Service System against the claim that it violated free exercise by conscripting persons who opposed a particular war on religious grounds."

If such a neutral law of general applicability may severely burden constitutionally protected interests in liberty, a comparable burden on property owners should not be considered unreasonably onerous.

Act, which simply transferred back to the surface owners certain rights that they had earlier sold to the coal companies, the Subsidence Act affected all surface owners—including the coal companies—equally. See *Keystone,* 480 U. S., at 486. Perhaps the most familiar application of this principle of generality arises in zoning cases. A diminution in value caused by a zoning regulation is far less likely to constitute a taking if it is part of a general and comprehensive land-use plan, see *Euclid* v. *Amber Realty Co.,* 272 U. S. 365 (1926); conversely, "spot zoning" is far more likely to constitute a taking, see *Penn Central,* 438 U. S., at 132, and n. 28.

The presumption that a permanent physical occupation, no matter how slight, effects a taking is wholly consistent with this principle. A physical taking entails a certain amount of "singling out."[8] Consistent with this principle, physical occupations by third parties are more likely to effect takings than other physical occupations. Thus, a regulation requiring the installation of a junction box owned by a third party, *Loretto* v. *Teleprompter Manhattan CATV Corp.,* 458 U. S. 419 (1982), is more troubling than a regulation requiring the installation of sprinklers or smoke detectors; just as an order granting third parties access to a marina, *Kaiser Aetna* v. *United States,* 444 U. S. 164 (1979), is more troubling than an order requiring the placement of safety buoys in the marina.

In analyzing takings claims, courts have long recognized the difference between a regulation that targets one or two parcels of land and a regulation that enforces a statewide policy. See, *e. g., A. A. Profiles, Inc.* v. *Ft. Lauderdale,* 850 F. 2d 1483, 1488 (CA11 1988); *Wheeler* v. *Pleasant Grove,* 664 F. 2d 99, 100 (CA5 1981); *Trustees Under Will of Pomeroy* v. *Westlake,* 357 So. 2d 1299, 1304 (La. App. 1978); see also *Burrows* v. *Keene,* 121 N. H. 590, 596, 432 A. 2d 15, 21 (1981); *Herman Glick Realty Co.* v. *St. Louis County,* 545 S. W. 2d 320, 324–325 (Mo. App. 1976); *Huttig* v. *Richmond Heights,*

---

[8] See Levmore, Takings, Torts, and Special Interests, 77 Va. L. Rev. 1333, 1352–1354 (1991).

372 S. W. 2d 833, 842–843 (Mo. 1963). As one early court stated with regard to a waterfront regulation, "If such restraint were in fact imposed upon the estate of one proprietor only, out of several estates on the same line of shore, the objection would be much more formidable." *Commonwealth* v. *Alger*, 61 Mass. 53, 102 (1851).

In considering Lucas' claim, the generality of the Beachfront Management Act is significant. The Act does not target particular landowners, but rather regulates the use of the coastline of the entire State. See S. C. Code Ann. § 48–39–10 (Supp. 1990). Indeed, South Carolina's Act is best understood as part of a national effort to protect the coastline, one initiated by the federal Coastal Zone Management Act of 1972. Pub. L. 92–583, 86 Stat. 1280, codified as amended at 16 U. S. C. § 1451 *et seq.* Pursuant to the federal Act, every coastal State has implemented coastline regulations.[9] Moreover, the Act did not single out owners of undeveloped land. The Act also prohibited owners of developed land from rebuilding if their structures were destroyed, see 1988 S. C. Acts 634, § 3,[10] and what is equally significant, from repairing erosion control devices, such as seawalls, see S. C. Code Ann. § 48–39–290(B)(2) (Supp. 1990). In addition, in some situations, owners of developed land were required to "renouris[h] the beach . . . on a yearly basis with an amount . . . of sand . . . not . . . less than one and one-half times the yearly volume of sand lost due to erosion." 1988 S. C. Acts 634, § 3, p. 5140.[11] In short, the South Carolina Act imposed substantial burdens on owners of developed and undeveloped

---

[9] See Zalkin, Shifting Sands and Shifting Doctrines: The Supreme Court's Changing Takings Doctrine and South Carolina's Coastal Zone Statute, 79 Calif. L. Rev. 205, 216–217, nn. 46–47 (1991) (collecting statutes).

[10] This provision was amended in 1990. See S. C. Code Ann. § 48–39–290(B) (Supp. 1990).

[11] This provision was amended in 1990; authority for renourishment was shifted to local governments. See S. C. Code Ann. § 48–39–350(A) (Supp. 1990).

land alike.[12]   This generality indicates that the Act is not an effort to expropriate owners of undeveloped land.

Admittedly, the economic impact of this regulation is dramatic and petitioner's investment-backed expectations are substantial.   Yet, if anything, the costs to and expectations of the owners of developed land are even greater: I doubt, however, that the cost to owners of developed land of renourishing the beach and allowing their seawalls to deteriorate effects a taking.   The costs imposed on the owners of undeveloped land, such as petitioner, differ from these costs only in degree, not in kind.

The impact of the ban on developmental uses must also be viewed in light of the purposes of the Act.   The legislature stated the purposes of the Act as "protect[ing], preserv[ing], restor[ing] and enhanc[ing] the beach/dune system" of the State not only for recreational and ecological purposes, but also to "protec[t] life and property."   S. C. Code Ann. § 48–39–260(1)(a) (Supp. 1990).   The State, with much science on its side, believes that the "beach/dune system [acts] as a buffer from high tides, storm surge, [and] hurricanes."   *Ibid.* This is a traditional and important exercise of the State's police power, as demonstrated by Hurricane Hugo, which in 1989, caused 29 deaths and more than $6 billion in property damage in South Carolina alone.[13]

In view of all of these factors, even assuming that petitioner's property was rendered valueless, the risk inherent in investments of the sort made by petitioner, the generality of the Act, and the compelling purpose motivating the South

---

[12] In this regard, the Act more closely resembles the Subsidence Act in *Keystone* than the Kohler Act in *Pennsylvania Coal Co.* v. *Mahon,* 260 U. S. 393 (1922), and more closely resembles the general zoning scheme in *Euclid* v. *Amber Realty Co.,* 272 U. S. 365 (1926), than the specific landmark designation in *Penn Central Transportation Co.* v. *New York City,* 438 U. S. 104 (1978).

[13] Zalkin, 79 Calif. L. Rev., at 212–213.

Carolina Legislature persuade me that the Act did not effect a taking of petitioner's property.

Accordingly, I respectfully dissent.

Statement of JUSTICE SOUTER.

I would dismiss the writ of certiorari in this case as having been granted improvidently. After briefing and argument it is abundantly clear that an unreviewable assumption on which this case comes to us is both questionable as a conclusion of Fifth Amendment law and sufficient to frustrate the Court's ability to render certain the legal premises on which its holding rests.

The petition for review was granted on the assumption that the State by regulation had deprived the owner of his entire economic interest in the subject property. Such was the state trial court's conclusion, which the State Supreme Court did not review. It is apparent now that in light of our prior cases, see, *e. g., Keystone Bituminous Coal Assn.* v. *DeBenedictis,* 480 U. S. 470, 493–502 (1987); *Andrus* v. *Allard,* 444 U. S. 51, 65–66 (1979); *Penn Central Transportation Corp.* v. *New York City,* 438 U. S. 104, 130–131 (1978), the trial court's conclusion is highly questionable. While the respondent now wishes to contest the point, see Brief for Respondent 45–50, the Court is certainly right to refuse to take up the issue, which is not fairly included within the question presented, and has received only the most superficial and one-sided treatment before us.

Because the questionable conclusion of total deprivation cannot be reviewed, the Court is precluded from attempting to clarify the concept of total (and, in the Court's view, categorically compensable) taking on which it rests, a concept which the Court describes, see *ante,* at 1016–1017, n. 6, as so uncertain under existing law as to have fostered inconsistent pronouncements by the Court itself. Because that concept is left uncertain, so is the significance of the exceptions to the compensation requirement that the Court proceeds to recog-

nize. This alone is enough to show that there is little utility in attempting to deal with this case on the merits.

The imprudence of proceeding to the merits in spite of these unpromising circumstances is underscored by the fact that, in doing so, the Court cannot help but assume something about the scope of the uncertain concept of total deprivation, even when it is barred from explicating total deprivation directly. Thus, when the Court concludes that the application of nuisance law provides an exception to the general rule that complete denial of economically beneficial use of property amounts to a compensable taking, the Court will be understood to suggest (if it does not assume) that there are in fact circumstances in which state-law nuisance abatement may amount to a denial of all beneficial land use as that concept is to be employed in our takings jurisprudence under the Fifth and Fourteenth Amendments. The nature of nuisance law, however, indicates that application of a regulation defensible on grounds of nuisance prevention or abatement will quite probably not amount to a complete deprivation in fact. The nuisance enquiry focuses on conduct, not on the character of the property on which that conduct is performed, see 4 Restatement (Second) of Torts § 821B (1979) (public nuisance); id., § 822 (private nuisance), and the remedies for such conduct usually leave the property owner with other reasonable uses of his property, see W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 90 (5th ed. 1984) (public nuisances usually remedied by criminal prosecution or abatement), id., § 89 (private nuisances usually remedied by damages, injunction, or abatement); see also, e. g., Mugler v. Kansas, 123 U. S. 623, 668–669 (1887) (prohibition on use of property to manufacture intoxicating beverages "does not disturb the owner in the control or use of his property for lawful purposes, nor restrict his right to dispose of it, but is only a declaration by the State that its use . . . for certain forbidden purposes, is prejudicial to the public interests"); Hadacheck v. Sebastian,

239 U. S. 394, 412 (1915) (prohibition on operation of brick-yard did not prohibit extraction of clay from which bricks were produced). Indeed, it is difficult to imagine property that can be used only to create a nuisance, such that its sole economic value must presuppose the right to occupy it for such seriously noxious activity.

The upshot is that the issue of what constitutes a total deprivation is being addressed by indirection, and with uncertain results, in the Court's treatment of defenses to compensation claims. While the issue of what constitutes total deprivation deserves the Court's attention, as does the relationship between nuisance abatement and such total deprivation, the Court should confront these matters directly. Because it can neither do so in this case, nor skip over those preliminary issues and deal independently with defenses to the Court's categorical compensation rule, the Court should dismiss the instant writ and await an opportunity to face the total deprivation question squarely. Under these circumstances, I believe it proper for me to vote to dismiss the writ, despite the Court's contrary preference. See, *e. g., Welsh* v. *Wisconsin,* 466 U. S. 740, 755 (1984) (Burger, C. J.); *United States* v. *Shannon,* 342 U. S. 288, 294 (1952) (Frankfurter, J.).